283 N.J. Super. 524 (1995)
662 A.2d 986
NELSON CHOU, COMPLAINANT-RESPONDENT, CROSS-APPELLANT,
v.
RUTGERS, THE STATE UNIVERSITY AND RUTGERS UNIVERSITY LIBRARY, RESPONDENTS-APPELLANTS-CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 8, 1995.
Decided August 7, 1995.
*527 Before Judges SHEBELL, SKILLMAN and KLEINER.
Aron M. Schwartz argued the cause for appellants-cross-respondents (Vogel, Chait, Schwartz and Collins, attorneys; Mr. Schwartz, on the brief).
David S. DeBerry argued the cause for respondent-cross-appellant (Wilentz, Goldman & Spitzer, attorneys; Mr. DeBerry, on the brief).
Jeffrey C. Burstein, Deputy Attorney General, argued the cause for respondent Division of Civil Rights (Deborah T. Poritz, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Mr. Burstein and Charles S. Cohen, Deputy Attorney General, on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
Rutgers University (Rutgers) appeals an administrative determination of the Director of the Division on Civil Rights (Director) that Rutgers violated the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, by failing to promote Dr. Nelson Chou to the position of Librarian I. The Director found that Rutgers failed to promote Chou in retaliation for Chou filing a previous civil rights complaint, in violation of N.J.S.A. 10:5-12(d), and because of discrimination based on race, ancestry and national origin, in violation of N.J.S.A. 10:5-12(a).
Chou, an immigrant from China, has been employed by Rutgers as a librarian since 1970. During this entire period, Chou has served as the librarian of the East Asian Library (EAL), a specialized library within the Alexander Library, the main research library at Rutgers' New Brunswick campus.
*528 Chou occupied the rank of Librarian III from 1970 through 1976. In the spring of 1975, Chou was notified that he was not going to receive tenure and that the 1975-76 academic year would be his terminal year. Chou responded to this notice in two ways. First, he filed a complaint with the Division on Civil Rights (Division) alleging that his termination constituted discrimination in employment based on national origin and ancestry. Second, he filed a grievance pursuant to the collective bargaining agreement between Rutgers and the AAUP, the faculty union, challenging his tenure denial and termination of employment. As a result of this grievance, Chou was re-evaluated for tenure as part of the 1976-77 promotion cycle, which resulted in his promotion to Librarian II with tenure, effective July 1, 1977. However, Chou continued to pursue his complaint before the Division, which ultimately resulted in a settlement on June 15, 1981, under which Rutgers agreed to pay Chou $2000 as damages for personal suffering and to refrain from taking reprisals against him for having filed a civil rights complaint. The settlement agreement stated that it did not constitute an admission of any violation of the LAD.
In the fall of 1982, Chou requested that he be evaluated for promotion to Librarian I during the 1982-83 promotion cycle.[1] The promotional review process with respect to a candidate like Chou commences with an evaluation by the faculty member's Department Committee, which consists of tenured librarians at or above the rank sought. The next step is evaluation by the Advisory Committee on Appointments and Promotions (the A & P Committee), which consists of four tenured librarians. The next evaluation is done by the Dean, who is the University Librarian, and is followed by a review by the Section, which has the same membership as the Department Committee. The next level of evaluation is the Promotion Review Committee (P.R.C.), consisting *529 of the Provosts  the chief academic officers of the New Brunswick, Newark and Camden campuses  and four faculty members in the highest rank of Professor II. Upon completion of its deliberations, the P.R.C. forwards its recommendations to the University President for his consideration. All positive P.R.C. recommendations are required to be forwarded to the Board of Governors. The President, in his discretion, also may recommend the promotion of a faculty member whom the P.R.C. has not recommended.
The promotion process requires that all material, including the written evaluations from prior levels, be considered at each successive level of evaluation. All written evaluations and support materials constitute a candidate's promotion packet. The criteria for promotion review involves an evaluation of five categories: professional effectiveness, which is equated with the competence with which a librarian performs his or her responsibilities; scholarly or creative activity, which is equated with the attainment of academic mastery in the candidate's discipline and is evidenced by participation in the instruction and training of other professionals or publications; research accomplishment; professional activities, and general usefulness. According to Rutgers' promotion policy, a candidate for promotion to Librarian I is required to have satisfied one or more of the criteria with distinction, and to have made substantial progress beyond that for which the candidate was recognized at the Librarian II level.
The Department Committee evaluated Chou's application and approved his promotion by a vote of seven to one, with one abstention. The Department evaluated Chou as outstanding in research accomplishments and scholarly/creative activity, and above average in the remaining three categories.
The A & P Committee, the next step in the promotional review process, was evenly divided, two-to-two, as to whether to recommend Chou for promotion, which under Rutgers' procedures was deemed a vote not to promote. The A & P Committee ranked Chou's scholarly/creative activity and professional activity as outstanding *530 and the remaining categories as above average. While the committee described Chou as an "effective professional," it concluded that his promotion packet did not document notable achievements since his promotion to Librarian II.
The next level of evaluation, the University Librarian, Hendrik Edelman, also declined to recommend promotion. He rated Chou as being average in general usefulness and above average in the remaining categories. Edelman also noted that he was working on restructuring Chou's assignments to allow more time for research and scholarly activity.
After the Section, comprised of the same membership as the Department Committee, recommended approval of Chou's promotion, the P.R.C. reviewed Chou's application and declined to recommend promotion. The P.R.C. found that while Chou "shows professional effectiveness in developing a specialized library and other professional contributions, together with intermittent scholarly and creative activity and some general usefulness[,] [t]he promotion [to the position of Librarian I] should not be considered until further growth has been demonstrated by creative contributions to the profession."
As a result of his unsuccessful attempt at promotion,[2] Chou filed a grievance in September 1983 under the Rutgers-AAUP collective bargaining agreement. Chou also filed a complaint with the Division in October 1983, alleging that his failure to be promoted was due to his national origin, ancestry and race and as a reprisal for his earlier discrimination complaint against Rutgers. The Grievance Committee, composed entirely of tenured faculty members, concluded that the evaluation procedures used by the A & P Committee and the University Librarian were "arbitrary and capricious."
*531 As a result of the Grievance Committee's finding, Chou's promotion application was remanded for reevaluation at all levels of review. The reevaluation took place during the 1984-85 promotion cycle and, by agreement, the reevaluation was based on Chou's 1983-84 promotion packet.
In the 1984-85 reevaluation, the Department Committee voted unanimously to recommend promotion. It rated Chou as outstanding in the area of professional effectiveness, scholarly/creative activity and research accomplishments, and it rated him as above average in the remaining two categories.
The A & P Committee also recommended that Chou be promoted by a vote of two to one with one abstention. The A & P Committee rated Chou as outstanding in the same categories as did the Department, as above average in professional activity and as average in general usefulness.
The University Librarian, who at that time was still Edelman, again declined to recommend promotion. He found Chou to be outstanding with respect to professional effectiveness, average in general usefulness and above average in the remaining categories.
After the Section voted to approve the promotion, the P.R.C. again refused to recommend Chou's promotion. The P.R.C.'s decision of March 14, 1985, stated in part:
The total body of publication in the post-tenuring years is modest; the assessments of it in the record do not establish that it has had significant impact in the development or practice of the profession. In the Committee's judgment, the candidate's record does not sufficiently show the continuing growth in professional effectiveness and the growing recognition for scholarly leadership which are necessary to justify promotion at this time.
Chou filed a second grievance from the denial of his promotion application. As a result, the parties agreed to a third evaluation of Chou's promotion packet during the 1985-86 promotion cycle. The parties agreed that the 1984 Department Committee evaluation would be included in the packet, obviating the need for that level of evaluation.
*532 A newly constituted A & P Committee voted unanimously to recommend Chou for promotion. The A & P Committee rated Chou as outstanding in professional effectiveness, scholarly/creative activity and research accomplishments; it rated him as above average in the remaining categories.
By the time of this third review of Chou's promotion application, Edelman had been replaced as University Librarian by Ralph McCoy, who recommended Chou's promotion. McCoy rated Chou as outstanding on professional effectiveness and above average in all other categories.
However, the P.R.C. again declined to recommend Chou's promotion, stating that:
The candidate's record in professional effectiveness shows well regarded service, particularly in the development of the collection for which he is responsible, as well as another generally useful contribution to his department and in his relationship to the teaching program. His professional activity has been appropriate to his rank. The assessments of his scholarly activity include praise for his body of scholarly translations attributed before his aware [sic] of tenure. However, the evaluations confirm that the publication record since tenuring has been modest and do not yet demonstrate the continuing professional growth or impact on the development of the profession which are necessary for this promotion.
Chou filed a third grievance from the promotion denial, and in May 1988 the Grievance Committee concluded that the P.R.C.'s decision violated promotion procedures and was "arbitrary and capricious."
In August 1988, Chou agreed to have his application for promotion evaluated by a specially constituted P.R.C., none of whose members had previously participated in his evaluations. The reevaluation would be based on Chou's 1985-86 promotion packet. The parties agreed that the P.R.C. Chair would appoint one or two external readers who would provide advice in a written report. The external readers he selected were Diane Perushek, the curator of the Gest Oriental Library at Princeton University, one of the leading oriental collections in the country, and Edward Holley, a professor and former dean at the University of North Carolina School of Information and Library Science, former Chief Librarian at the University of Houston, and a nationally recognized figure *533 in the library and information science field. Based on the evaluation set forth in their comprehensive report, which is quoted at length later in this opinion, these readers declined to recommend Chou's promotion.
In December 1988, the specially constituted P.R.C. denied Chou's promotion. The P.R.C.'s decision, which also is quoted at length later in this opinion, concluded that "[t]he assessments of his scholarly and creative activity ... do not demonstrate the sustained professional growth and the recognition for important contributions to the practice of the profession associated with the rank of Librarian I."
While Chou's grievance from the third denial of his application for promotion was pending, the Division issued an "agency determination" on July 10, 1987, finding "probable cause" to believe that the denial of Chou's promotion application had been for retaliatory or discriminatory reasons, see N.J.S.A. 10:5-14, but finding a lack of evidence to support Chou's claims that various administrative actions affecting him were the product of retaliation or discrimination. On February 3, 1988, Rutgers filed a motion to dismiss the complaint on the ground that it was filed beyond the 180-day limitations period provided in N.J.S.A. 10:5-18. On May 23, 1988, an Administrative Law Judge (ALJ) issued a letter opinion, denying Rutgers' motion to dismiss as well as its motion to limit the issues to the denial of promotion in the 1982-83 promotion cycle, while granting Chou's motion to amend the complaint to include promotion denials subsequent to the 1982-83 cycle.
An administrative hearing was held before another ALJ over a sixteen day period in May, June and July of 1989. After receiving post-hearing submissions from the parties, the ALJ issued a written initial decision on June 22, 1990, which found that "Henry Edelman, in his capacity as University Librarian, retaliated against Nelson Chou for asserting his civil rights with the New Jersey Division on Civil Rights in 1975 through 1981 and thereafter" and that "the prejudicial involvement of Henry Edelman at the critical Dean Evaluation Level irrevocably tainted the process *534 requiring promotion of Nelson Chou to Librarian I". The ALJ also found that "[e]xcept for Henry Edelman, the evaluators performed in accordance with their perception of applicable professional criteria." However, he went on to say that "there is no legitimate way to assess the impact of the Edelman taint on the deliberations." Based on these findings, the ALJ concluded that Rutgers' refusal to promote Chou was an act of retaliation. The ALJ therefore recommended that Rutgers be directed to promote Chou to the position of Librarian I, with seniority retroactive to the 1982-83 promotion cycle, and that he be awarded back pay and benefits retroactive to that date. The ALJ also concluded that "Nelson Chou experiences such pain and humiliation, endures such anxiety in his personal and professional life, and suffered such a deleterious affect on his career, all of which are a proximate result of [Rutgers'] retaliatory behavior and the consequences arising therefrom over a period of a decade, that the additional payment to him of $150,000 in compensatory damages is required" and that "[Rutgers'] continuing indifference, insensitivity and intentional toleration of Henry Edelman's notorious abusive retaliatory behavior requires the payment of $100,000 in punitive damages to Nelson Chou."
On February 4, 1991, the Director issued a decision which affirmed the ALJ's May 23, 1988, decision that Chou's complaint should not be dismissed as untimely and affirmed certain of the ALJ's evidentiary rulings, but remanded to the ALJ with respect to the remaining aspects of the case "for further factual findings and legal conclusions." The Director stated during the course of his opinion:
[T]he initial decision in this matter ... does not meet the statutory mandate that is a procedural predicate for resolution of the merits of this contested case for the following reasons: (1) the testimony of witnesses is not summarized or analyzed, (2) the findings of fact are incomplete and do not support the conclusions of law and (3) it is unclear whether all claims underlying Dr. Chou's complaint were fully considered.
....
[T]he ALJ must address whether and to what extent the evidence, if any, revealed that Dr. Chou would have obtained the promotion to Librarian I, but for Mr. *535 Edelman's discriminatory acts. The ALJ must also discuss whether Mr. Edelman's involvement influenced or prejudiced the PRC committee and/or Dr. Pond and what impact the outside readers may have had in their advisory role with the PRC. Was the PRC predisposed to deny the promotion to Dr. Chou because of Mr. Edelman's retaliatory behavior or did the PRC make its decision based on nondiscriminatory reasons? Were the recommendations by the outside readers conclusive on the issue of whether Dr. Chou should have been promoted in the first instance or were these recommendations merely advisory and not binding on the PRC's determination?
The Director also stated that "the ALJ must clarify whether he found that Rutgers discriminated against Dr. Chou on the basis of his race, national origin and/or ancestry with respect to his promotion denial."
After the remand from the Director, the ALJ issued a second recommended initial decision on June 27, 1991, which again failed to contain detailed findings of fact. Instead, he stated in broad conclusionary terms:
I ADOPT complainant's position evidenced through the testimony he elicited on the record and his submissions admitted to evidence.
....
I found none of the testimony of [Rutgers'] witnesses credible. After considering the entire record, I cannot believe [Rutgers'] version of what occurred and do believe the complainant's reconstruction of events based upon his testimonial and documentary presentation.
....
Upon careful reflection, I now realize the merit, in its entirety, of complainant's positions, which I did not recognize fully last year.
....
So there can be no misunderstanding, I have adopted as my own findings the complainant's proposed rationale and his proposed findings of fact and proposed findings of law except as otherwise stated herein or set forth in my original initial decision. I adopt complainant's justifications as mine, as I agree with them. I specifically reject those proffered by the [Rutgers] as unworthy of credibility.
The ALJ then reaffirmed his original findings regarding Edelman's retaliatory motivations for failing to recommend Chou for promotion. The ALJ thereupon proceeded to increase the amount of the compensatory damage award in favor of Chou for "pain and humiliation" from $150,000 to $500,000 and the amount of punitive damages from $100,000 to $250,000. The ALJ also found that *536 Chou had been unlawfully denied a merit increment and directed that such increment be paid.
Although the ALJ's findings of fact and conclusions of law in his second decision were again patently inadequate, the Director, rather than remanding the matter for a second time, instead reviewed the record and made his own extensive findings and conclusions in a written decision dated July 31, 1992. The Director adopted the limited findings made by the ALJ in his original decision, but simply ignored the broad conclusionary statements regarding credibility made by the ALJ in his second decision. The Director reversed the ALJ's conclusion that Chou had been unlawfully denied a merit increment. However, the Director affirmed the ALJ's conclusion that Rutgers denied Chou's promotion in retaliation for his 1975 civil rights complaint. The Director further concluded that Rutgers had denied Chou's promotion on the basis of national origin, ancestry and race. Accordingly, the Director ordered Rutgers to promote Chou to the position of Librarian I, retroactive to July 1, 1982, and to pay him back pay with interest from that date. The Director also concluded that "Dr. Chou is entitled to a substantial pain and humiliation award but that the ALJ's $500,000 award should be reduced to $150,000." In addition, the Director ordered Rutgers to pay $2,000 in penalties, in accordance with N.J.S.A. 10:5-14.1a. However, the Director concluded that an award of punitive damages would not be appropriate. The Director further concluded that Dr. Chou, as the prevailing party, was entitled to reasonable fees in accordance with N.J.S.A. 10:5-27.1, but that, "[b]ecause there is no evidence to establish the precise amount of attorneys fees owed to Dr. Chou to date, the parties will be ordered to enter into negotiations in an attempt to stipulate to the amount of fees owed and if such stipulation cannot be agreed to, then this issue will be remanded to [the] OAL."
On September 16, 1992, Rutgers filed a notice of appeal from the Director's July 31, 1992 decision. On October 30, 1992, we dismissed Rutgers' appeal on the ground that it was not final with *537 respect to the issues of counsel fees and back pay. However, on February 1, 1993, we entered an order granting Rutgers' motion for leave to appeal. On February 17, 1993, Chou filed a notice of cross-appeal from the Director's damages award.
On appeal, Rutgers argues that (1) Chou's complaint should have been dismissed because it was not filed within the 180 day limitations period prescribed by N.J.S.A. 10:5-18, (2) the ALJ erred in admitting evidence of administrative actions affecting Chou when the Director had previously concluded that there was no probable cause to believe that those actions were retaliatory or discriminatory, (3) there is a lack of substantial credible evidence in the record to support the Director's conclusion that Rutgers' failure to promote Chou was in retaliation for his previous civil rights complaint and was unlawfully discriminatory, and (4) the award of $150,000 for pain and humiliation was not purely "incidental" to equitable relief and therefore must be set aside. On his cross appeal, Chou seeks the reinstatement of the full $750,000 in compensatory and punitive damages that the ALJ awarded in his second decision.
We conclude that the Director correctly denied Rutgers' motion to dismiss Chou's complaint on the ground of untimeliness or, in the alternative, to limit that complaint to the 1983 and 1988 denials of promotion, substantially for the reasons expressed in the ALJ's written decision of May 23, 1988, and the Director's decision of February 4, 1991. However, we also conclude that there is a lack of substantial credible evidence to support the Director's conclusion that Rutgers violated the LAD by retaliating against Chou for his prior civil rights complaint and by discriminating against Chou on the basis of his national origin, ancestry and race. Therefore, we reverse the Director's decision that Rutgers violated the LAD. This conclusion makes it unnecessary for us to reach the damages issues raised in the final point of Rutgers' brief *538 and in Chou's cross appeal.[3]
In cases alleging discrimination through disparate treatment, courts have adopted a three-step procedure: (1) the complainant must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the employer must then show a legitimate non-discriminatory reason for its decision; and (3) the complainant must be given the opportunity to show that the employer's stated reason was merely a pretext or discriminatory in its application. Dixon v. Rutgers, 110 N.J. 432, 442, 541 A.2d 1046 (1988).
In the usual discrimination case involving an academic promotion, a complainant establishes a prima facie case by showing that (1) complainant was a member of a class protected by the anti-discrimination law; (2) complainant was qualified for the position or rank sought; (3) complainant was denied promotion; and (4) others with similar or lesser qualifications achieved the rank or position. Id. at 443, 541 A.2d 1046. In a failure to promote context involving a claim of retaliation, a complainant establishes a prima facie case by proving by the preponderance of the evidence that (1) the complainant engaged in a protected activity that was known to the employer, (2) the promotion sought was denied, and (3) the complainant's engagement in the protected activity was a cause of the promotion denial. Jamison v. Rockaway Township Bd. of Educ., 242 N.J. Super. 436, 447, 577 A.2d 177 (App.Div. 1990).
Once the complainant makes a prima facie showing, the burden of going forward, but not the burden of persuasion, shifts to the employer to articulate some legitimate non-retaliatory *539 reason for the adverse action. Id. at 445, 577 A.2d 177. If the employer articulates such a reason, the complainant is afforded an opportunity to show by a preponderance of the evidence that the employer's action was motivated by retaliatory or discriminatory reasons. Ibid. Nonetheless, the complainant retains the ultimate burden of persuasion. Erickson v. Marsh & McLennan Co., 117 N.J. 539, 550, 569 A.2d 793 (1990); see also St. Mary's Honor Center v. Hicks, ___ U.S. ___, ___-___, 113 S.Ct. 2742, 2747-50, 125 L.Ed.2d 407, 416-19 (1993).
The principles that govern our review of a decision of the Division or other state agency are well established. We are required to uphold an agency's factual determination if it "could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard to the opportunity of the one who heard the witnesses to judge of their credibility ... and ... with due regard also to the agency's expertise where such expertise is a pertinent factor." Jackson v. Concord Co., 54 N.J. 113, 117-18, 253 A.2d 793 (1969) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965)). However, while we extend substantial deference to agency fact finding, our review of an agency's decision is not simply a pro forma exercise in which we rubber stamp findings that are not reasonably supported by the evidence; "it calls for careful and principled consideration of the agency record." Mayflower Securities Co. v. Bureau of Securities, 64 N.J. 85, 93, 312 A.2d 497 (1973); see Kearney Generating Sys. v. Roper, 184 N.J. Super. 253, 260, 445 A.2d 1159 (App.Div.), certif. denied, 91 N.J. 254, 450 A.2d 571 (1982).
The role of the courts in dealing with claims of discrimination in connection with tenure and promotion decisions in academia also should be kept in mind:
Wherever the responsibility lies within the institution, it is clear that courts must be vigilant not to intrude into that determination, and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and *540 unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges.
[Kunda v. Muhlenberg College, 621 F.2d 532, 548 (3d Cir.1980).]
Consequently, "[w]hen a decision to hire, promote or grant tenure to one person rather than another is reasonably attributable to an honest even though partially subjective evaluation of their qualifications, no inference of discrimination can be drawn." Lieberman v. Gant, 630 F.2d 60, 67 (2nd Cir.1980); accord Jiminez v. Mary Washington College, 57 F.3d 369 (4th Cir.1995); Bina v. Providence College, 39 F.3d 21 (1st Cir.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1406, 131 L.Ed.2d 292 (1995); Villanueva v. Wellesley College, 930 F.2d 124, 131 (1st Cir.) cert. denied, 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991); Molthan v. Temple Univ., 778 F.2d 955, 962 (3rd Cir.1985); Zahorik v. Cornell Univ., 729 F.2d 85, 92-94 (2nd Cir.1984).
The focus of the Division's findings against Rutgers were the actions of a single person, the former University Librarian, Hendrik Edelman. Indeed, the ALJ found in his initial decision that "Henry Edelman, in his capacity as University Librarian, retaliated against Nelson Chou for asserting his civil rights with the New Jersey Division on Civil Rights in 1975 through 1981 and thereafter" but that "[e]xcept for Henry Edelman, the evaluators performed in accordance with their perception of applicable professional criteria." The Director's decision adopted these findings "as his own." Although the Director stated certain other conclusions later in his decision, discussed infra, indicating that other Rutgers' officials also participated in the retaliation and discrimination that he found to have been committed against Chou, the Director's decision also focussed upon Edelman's conduct. Therefore, it is appropriate to discuss Edelman's tenure as University Librarian in some detail.
Edelman was appointed University Librarian in January of 1979, more than three years after Chou filed his original civil rights complaint against Rutgers challenging the denial of his *541 promotion to Librarian II and nearly two years after Chou had been appointed to that position based on a university grievance proceeding. Edelman had been an administrator at another university prior to his appointment as University Librarian at Rutgers, and it is undisputed that he had no involvement in the denial of Chou's promotion to the position of Librarian II, the grievance proceedings that resulted in the reversal of that action, or Chou's original civil rights complaint which resulted in the settlement under which Chou was awarded $2,000 for pain and humiliation. Indeed, Edelman testified that he did not recall whether, or when, he may have become aware of that complaint.
Edelman's responsibilities as University Librarian were extensive. He was responsible for the operation of twenty-two different Rutgers libraries located in Newark, New Brunswick and Camden. This operation involved a budget of approximately $14 million and a staff of 250 to 300 people, including between 100 and 110 librarians with faculty rank. Edelman's responsibilities included making all hiring decisions and making recommendations regarding the promotion and tenure of librarians. Edelman estimated that he was required to make between twelve and fifteen such recommendations each year.
Edelman's performance of these responsibilities was marked by controversy and discord. Edward T. Pason, Associate University Librarian for Public Services, characterized Edelman as "irrational" and "erratic." Pason also indicated that Edelman made quick judgments about the librarians working under him and tended to play favorites. George Kanzler, head Librarian at the Alexander Library, characterized Edelman as "unreliable," "irrational" and "erratic." Kanzler also indicated that the strong differences of opinion between Edelman and the librarians on a number of significant issues relating to the operation of the library system created morale problems and dissension. In describing this dissension, Kanzler stated:
I think originally the main issue was one over governance. The one group felt faculty governance meant the library faculty being involved in deliberations, being consulted, being able to offer advice on the direction that the library should take *542 and the Edelman administration taking a position that it was strictly managerial prerogative that did not have to be that kind of consultation.
Several witnesses also indicated that Edelman would react in a hostile manner if members of the Library Department opposed any of his proposed changes.
Edelman's administration of the Library Department involved several administrative changes that substantially impacted upon the EAL and Chou, including the transfer of one of Chou's assistants, Dora Chen, in order to afford her an opportunity to broaden her experience and thereby improve her chances for promotion; her replacement with a lower paid person; the transfer of "technical services operations" of the EAL into a centralized facility in order to improve efficiency through economies of scale, and an effort to increase the extent of interlibrary cooperation between the EAL and similar facilities at Columbia and Princeton universities. Edelman made a number of these changes in response to budget constraints to which Rutgers was being subjected during the period of his tenure.
Chou expressed his dissatisfaction with a number of these administrative changes affecting the EAL in rather emphatic language. For example, shortly after Kanzler returned from a sabbatical, Chou sent him a memorandum, dated February 1, 1982, which stated:
For the majority part of the year, I was the lone worker at the EAL. I felt that I were a prisoner sitting in a cell and could not even afford to be sick. For the complex nature of the problems, I have to go into great details. I am attaching this detailed document "The East Asian Library in 1981" and all the supporting documents for your perusal.
For future operations of the EAL, I request a written statement (which I have never received in 11 years) from my superior(s) to clarify the missions of the EAL and to instruct me what to do explicitly.
Chou attached a five-and-a-half page document to this memorandum which set forth a litany of complaints about Edelman and the person who had been the head of Alexander Library in Kanzler's absence as well as his perception of the general lack of adequate support for the EAL. One part of this document was directed specifically at Edelman:

*543 Hendrik Edelman called me into his office on March 2, 1981 (a Monday) to inform me that there were going to be some changes in the Planning and Research Office, and that Donald Luck would be in charge of the Office along with several clerical people, and that I should move out of the EAL immediately in the afternoon. I was caught in total surprise since the agreement was to have me alone in the Office in the initial stage so that I might have a better chance to sort out the priorities, identify the problems, and set up procedures. I told Hendrik Edelman then that I needed some time to think the matter over and also asked him what the rush was since I was not due to be back in two weeks. He demanded an answer in the afternoon of the same day. I told him that I needed at least over night. He then asked me to come back to his office [the] next morning at 8:30 a.m. I went as I had been told and presented to him three alternatives for his discretion. The last one was that I stay as the East Asian Librarian. I told him that it was the best I could suggest at the moment, and that I was willing to discuss the matter further with him if he had other ideas. He said that there was no reason to talk any further and I should stay at the EAL and Dora Chen be transferred, and that, in return for Chen, I would get a high level clerk. I was then rushed out of his office.
Kanzler gave a copy of these documents to Edelman.
Eventually, Edelman's administration of the university's system and his treatment of the librarians under his supervision generated so much animosity that thirty-nine of the fifty tenured librarians, including Chou, jointly signed a letter to the President of Rutgers suggesting that Edelman be removed from his position. This letter stated in part:
[Mr. Edelman] has not displayed the interpersonal and managerial skills essential in mobilizing the library faculty and staff. In a word, Mr. Edelman does not have the trust and confidence of the library faculty.
Chou testified that the signatories thought Edelman was a "bad manager" who "took things very personally." Due partly to the problems reflected by this letter, Edelman was removed as University Librarian sometime in 1985.
Viewed in this light, we discern no basis for inferring that Edelman's administrative actions that adversely affected Chou were the product of retaliation or discrimination rather than simply a manifestation of Edelman's somewhat dictatorial and erratic management style that ultimately resulted in his removal *544 from the position of University Librarian.[4] Even Kanzler, one of Chou's principal witnesses, acknowledged that there was a reasonable basis for the administrative actions affecting Chou with which he was involved. Kanzler indicated that the reason Dora Chen was transferred out of the EAL was to broaden her experience and improve her chances of obtaining tenure:
[B]y staying in East Asian Library [she] would have very little exposure to anyone other than East Asian cliental. And [her] area of competence or [the] expertise [she] would be able to display would be very limited.... So there was concern about how general[ly] useful [she] would be if [she] had gotten tenured, to do other things. If East Asian studies today exist or whatever, there was concern to have [her] exposed to other things and work in other areas.[5]
Kanzler also indicated that there was a reasonable basis for the decision to construct a new graduate student reading room in the EAL's space, because the area on the fourth floor set aside for the reading room has attractive large windows facing the front of the library and only limited activity, and thus provides a quiet atmosphere for graduate students. In addition, Kanzler indicated that he, rather than Edelman, was the one primarily responsible for this decision. Kanzler also explained the reason this construction work was done without any substantial advance notice to Chou:
One of the problems that occurs at Rutgers is that when we do have work done we are at the mercy of the Rutgers maintenance people and construction people. And so we often are given very short notice in terms of when something can be done. They had the work order. It was clear that that work was to be done. When that became available was something we just had to tolerate. Often they have projects, as I recall this was done during the summer, they have projects of much higher *545 priority because of space or whatever for September. We did, I believe get them on very short notice. They came in and it was done.
Although Kanzler had no involvement with the "Joseph Cheng" incident, Edelman's involvement was also very limited. Due to Cheng's insistence that he, rather than Chou, attend a meeting with Edelman, a decision subsequently supported by the acting head of Alexander Library and Edelman, and other apparent conflicts between Chou and Cheng, Chou demanded that Cheng be fired. However, when the matter reached Edelman, he agreed with the acting head's recommendation that Cheng should be transferred instead. In so doing, Edelman effectively preserved the job of one employee of Chinese national origin against the attempts of another employee of Chinese national origin to have him fired. Edelman explained that he perceived the problem to be a personality conflict, and that he believed the transfer of Cheng accomplished Chou's objective of getting rid of Cheng while giving Cheng an opportunity to be productive elsewhere. Therefore, even taking the most indulgent possible view of Chou's proofs, they show at most that Edelman was inconsiderate in his dealings with Chou relating to the administrative changes in the EAL.
For similar reasons, we see no basis for inferring that Edelman's evaluation of Chou's application for promotion was the product of retaliation for his 1975 civil rights complaint or discrimination. As previously noted, Edelman had no involvement whatsoever with the initial denial of Chou's promotion to Librarian II or with his grievance proceedings and civil rights complaints arising out of that denial. But after he became University Librarian, Edelman had significant dealings with Chou, some rather contentious, resulting from Edelman's efforts to impose his management policies on the operation of the EAL. Therefore, even if Edelman's evaluations of Chou were not completely fair and impartial (a conclusion for which we find meagre support in this record), the most reasonable explanation would be animosity derived from the personal interactions between Edelman and *546 Chou rather than Chou's prior civil rights complaint or his national origin, ancestry or race.
We also find a lack of sufficient support in the record for the conclusion that Edelman's evaluation resulted in the denial of Chou's promotion application. Dr. Alexander T. Pond, the Executive Vice President and Chief Academic Officer of Rutgers, who serves as Chair of the P.R.C. without vote, expressed the opinion that the P.R.C. would have rejected Chou's promotion application even if Edelman had recommended the promotion. This opinion is supported by the fact that after Edelman's removal, the P.R.C. twice declined to recommend Chou's promotion even though the new University Librarian supported his application. Therefore, Edelman's actions with respect to Chou do not provide a factual basis for the Director's conclusion that Rutgers' denial of Chou's promotion application was the product of retaliation or discrimination.
We now turn to the Director's other findings upon which he based his conclusion that Rutgers violated the LAD in denying Chou's promotion application. Despite the Director's adoption on page twenty of his decision of the ALJ's finding that "[e]xcept for Henry Edelman, the evaluators performed in accordance with their perception of applicable professional criteria" and the total absence in either of the ALJ's decisions of any specific finding that any individual other than Edelman acted in a retaliatory or discriminatory manner, the Director's decision states in broad conclusionary terms, without supporting discussion of the evidence, that other Rutgers officials, in particular Dr. Pond, also acted for retaliatory and discriminatory reasons. Thus, at page 161 of his decision, the Director, without any prior discussion of Dr. Pond's extensive testimony, concludes broadly:
After reviewing all of the testimony and documents in this matter the Director concludes that Dr. Chou proved that the reasons articulated by Rutgers for the personnel and management problems that Dr. Chou faced in 1981 and the four denials of promotion in 1982-83, 1984-85, 1985-86 and 1988 were pretextual. Moreover, the Director concludes that but for the retaliatory conduct and motives of Mr. Edelman and Dr. Pond, Dr. Chou would have been promoted to Librarian I.
*547 Four pages later, at page 165, the Director again states in conclusionary language:
The Director finds the determinations of the grievance committees are of probative value on the issue of pretext. Moreover, as indicated earlier the Director finds the conduct of Mr. Edelman, Dr. Pond and others, which was the basis of the committee findings, to be probative of retaliatory intent.
The closest the Director ever gets to a discussion of Dr. Pond's testimony is the following statement on page 168 of his opinion:
The evaluation of external letters in the academic promotion context is purely subjective. Evaluation of solicited letters of evaluation by peer committees and university administrators is an important part of the promotion process. Here, there is a sharp contrast between the evaluation of Dean Edelman, Dr. Pond and the P.R.C. and many other peer review bodies regarding the impact of the external letters in Dr. Chou's promotion packet. The Director finds that the evaluation of these letters is probative to the issue of whether Rutgers was motivated by retaliatory intent.
The only additional mention of Dr. Pond in the Director's discussion of Chou's retaliation claim occurs at page 171 of his opinion, where he states:
The consistent and overwhelming vote by Dr. Chou's peers in favor of his promotion and the consistent opposition to the promotion by Mr. Edelman, Dr. Pond and the P.R.C. is highly probative of retaliation and supports a conclusion that the negative recommendations of Mr. Edelman and Dr. Pond were based on retaliatory motives.
This discussion of Dr. Pond's role in the review of Dr. Chou's promotion application is patently inadequate and does not provide any foundation for a finding that Dr. Pond's actions were motivated by any purpose other than his conception of the best interests of the university. Therefore, it is necessary for us to make an independent review of Pond's testimony.
Pond was appointed to his position at Rutgers in 1982, seven years after Chou filed his initial complaint with the Division and five years after Chou was appointed to the position of Librarian II. Like Edelman, Pond was employed by another university prior to being appointed the Executive Vice President of Rutgers, and he had no involvement with the initial denial of Chou's promotion to Librarian II or with the subsequent grievance proceeding and civil rights case arising out of that denial.
*548 As previously noted, Pond's duties include serving as the non-voting chair of the P.R.C., which considers between 180 and 200 promotion applications each year. Pond's office provides secretarial services to the P.R.C., and he prepares the P.R.C.'s reports on each applicant for promotion based on the committee members' comments. In deciding whether to recommend a promotion, the P.R.C. considers not only the comments and recommendations of the Department Committee, the A & P Committee, the dean of the applicant's institution and the Section, but also the comments of outside evaluators. Pond indicated that departments within the university differ regarding the rigor with which they evaluate candidates for promotion, and that the Library Department was "[b]elow the average in terms of rigor."
Rutgers presented an exhibit prepared by Pond's office which showed that of 134 candidates who had been recommended for promotion to the rank of professor at all prior levels of review, the P.R.C. declined to recommend promotion in 39 cases and the candidate was not promoted in all but 6 of those cases. Thus, the P.R.C. performs a significant role in screening out candidates recommended by their departments who do not satisfy university-wide standards for promotion to the particular faculty rank in question.
We can discern no evidence in the record that Pond performed his responsibilities as Chair of the P.R.C. in a discriminatory or retaliatory manner. Indeed, we see no evidence that Pond was even made aware of Chou's 1975 civil rights complaint, and the Director made no express finding that any information about that complaint was communicated to Pond. Moreover, even if Pond was somehow made aware of Chou's civil rights complaint, we see no basis for inferring that it in any way influenced his conduct as Chair of the P.R.C. Therefore, the only permissible inference from the evidence in the hearing record is that Pond participated in the P.R.C.'s consideration of Chou's promotion application in the same routine manner in which he participates in the hundreds of other applications that come before the P.R.C. each year.
*549 Moreover, the actual decisions of the P.R.C. were not made by Pond, who was a non-voting member, but rather by its seven voting members.[6] During the period from 1983 to 1986 when Chou's promotion application was reviewed the first three times, a total of eleven different persons served on the P.R.C. as voting members. Chou did not present any evidence that any of these persons had a retaliatory or discriminatory motive for declining to recommend him for promotion. There is also a total absence of any evidence that Pond dominated or even exercised a substantial influence over the deliberations of this body.
When Chou's application was reconsidered in 1988, a special ad hoc P.R.C. was established consisting of seven persons who had not participated in any way in prior evaluations of Chou. Moreover, Pond testified without contradiction that he did not participate at all in the deliberations of this specially constituted P.R.C., and Chou presented no evidence that any of these P.R.C. members had any retaliatory or discriminatory motives for declining to recommend him for promotion.
Despite the absence of any evidence that any members of the P.R.C.s were even aware of Chou's prior civil rights complaint, the Director concluded that the denial of Chou's promotion application was retaliatory because the P.R.C. used a "different standard for assessing Dr. Chou's scholarly/creative activities and research accomplishments" from that used in assessing another librarian, Benjamin Beede. There are a number of substantial problems with this analysis. First, the P.R.C. considered Chou's promotion application a year after it considered Beede's application, during which time four of the seven members of the P.R.C. had changed. Second, although Chou and Beede were both librarians, their duties within the library system and their professional *550 achievements were so different that a comparison of the evaluations of their promotion applications is exceedingly difficult. Chou managed a collection of materials in the Chinese, Japanese, and Korean languages, while Beede was a reference and acquisitions librarian at the Camden Law Library and, later, a reference librarian and instructional coordinator at the Kilmer Library. Chou's area of scholarship and research involved primarily the computerization of the Chinese language, while Beede principally worked on bibliographical research in the areas of public policy, political science, and history. Chou's publications were primarily either translations, papers presented at conferences in connection with research regarding the computerization of the Chinese language, or book reviews, while Beede's publications took the form of book-length bibliographies. Therefore, the Director impermissibly substituted his judgment for that of the P.R.C.s in comparing the Chou and Beede promotion packets and deciding that Chou should have been promoted to the position of Librarian I. In any event, even assuming that the record would reasonably support a finding that Chou's qualifications for promotion were equal to or superior to those of Beede, we would see no basis for drawing an inference from this fact alone that there was a retaliatory or discriminatory motivation behind the P.R.C.s' decisions to deny Chou promotion. See Villanueva v. Wellesley College, supra, 930 F.2d at 131 ("[E]vidence that, at best, indicates that [a plaintiff] was as qualified as other tenure candidates does not suffice" to show unlawful discrimination).
The Director also relies upon the Grievance Committee decisions which concluded that the procedures used by Rutgers in the 1982-83 and 1985-86 evaluations were arbitrary and capricious, as supporting his conclusion that the denial of Chou's promotion application was retaliatory and discriminatory. However, the Grievance Committees did not find that the denial of Chou's promotion had been retaliatory or discriminatory. The Grievance Committees' criticisms of the review of Chou's promotion application were mostly procedural. For example, in *551 discussing the evaluation of the original A & P Committee, the 1984 Grievance Committee decision stated:
While it is true that the diversity of Dr. Chou's scholarly endeavors (articles in two languages, translations, book reviews) make it particularly difficult to evaluate his research accomplishments, the level of accomplishment does not appear to be significantly different from the level which he sustained in the early 1970s and for which he was promoted.... Given these circumstances the Committee's conclusion about research accomplishments needs to be argued with more care than it is.
And in discussing Dr. Edelman's evaluation of Chou, the Grievance Committee stated:
The general problem with Dr. Edelman's comments is that they do not show the close, detailed consideration of a case which is presumably necessary whenever the dean decides, as he does here, not to concur with the department's judgment of a candidate's performance. Given the mixed message (the split vote) sent by the Appointments and Promotions Committee, careful analysis would appear to be especially necessary in this case. Without this argumentation the dean's judgments appear to have been arrived at in a cursory, capricious fashion.
The 1988 Grievance Committee's conclusions were similar. Thus, in discussing the University Librarian's evaluation (which had recommended Chou's promotion), the committee stated:
[T]he flaws in the University Librarian's evaluation of Dr. Chou are so gross as to constitute a material violation of promotional procedures. We further conclude that the University Librarian failed to meet the obligations that were clearly and explicitly imposed on him by the Mitchell memorandum. Finally, therefore, we conclude that the University Librarian's failure to produce an adequate evaluation of Dr. Chou constitutes arbitrary and capricious behavior.
And in discussing the P.R.C.'s decision, the committee stated:
Of course, we do not presume to judge whether the entire body of Dr. Chou's work after 1977 was either better or worse than his pre-1977 work: that would require detailed scrutiny of that work, and this is the job of evaluative bodies, including the PRC. But it is clear that the PRC completely failed to take on this job, and that it was content simply to claim  without providing details of any kind  that the post-1977 work fell short of what was necessary for promotion.... [T]his constitutes a conspicuous, serious and material procedural violation.
The 1988 Grievance Committee also stated that "the PRC denied Dr. Chou's proposed promotion on the basis of personal prejudice." However, the committee clearly indicated that this "personal prejudice" consisted of the PRC prejudging the merits of Chou's promotion application based on its prior review (the *552 membership of the P.R.C. was the same in 1986 as in 1985), rather than acting on the basis of retaliatory or discriminatory motives:
[T]he PRC saw the evaluations as "confirming" views that do not appear in the 1986 packet, including, in particular, its own previous adverse views.
....
[I]t prejudged the question of his promotion, ignored evidence contrary to its assessment and falsely claimed the existence of evidence that "confirmed" it [sic] preordained conclusion.
In sum, to the extent that either the May 7, 1984 or May 28, 1988 Grievance Committee decisions identified any deficiencies in the 1982-83 or 1986 promotion evaluations of Chou, they do not establish that his application was denied for retaliatory or discriminatory reasons.
Moreover, after the 1988 Grievance Committee decision, Rutgers established a special P.R.C. composed entirely of persons who had not been members of any of the prior P.R.C.s that had declined to recommend Chou for promotion, and also retained two distinguished outside consultants to prepare a new, independent review of Chou's promotion packet. This promotion review procedure, to which Chou agreed, corrected any procedural deficiencies that may have been identified in the prior reviews and clearly demonstrated that the denial of Chou's promotion application was fair and non-retaliatory.
The report submitted by the outside consultants retained by Rutgers reflects a careful and thorough review of Dr. Chou's scholarly, research and creative accomplishments that we consider appropriate to quote at length:
Scholarly and Creative Activity (Major Significance)
As the 1984 Department Discussion and Recommendations point out, Dr. Chou translated four articles by Don Swanson and authored one himself between 1977 and 1983. In addition, he presented three original papers which subsequently appeared as published conference proceedings. Among East Asian librarians in the United States, his productivity is above average. The translations, which are time-consuming undertakings, contributed to Taiwanese librarians' knowledge concerning the theories and theses of Don Swanson. These would be groundbreaking articles of much interest to Chinese librarians who wish to know the best of American library literature. Translations in general are important in contributing *553 to the advancement of international scholarship, and Chou was among the few who translated articles from major American journals for publication in Taiwan.
The original article and papers, mostly vehicles for disseminating information from Chou's University of Chicago Ph.D. thesis, also no doubt provided librarians in Taiwan and Hong Kong with new, at that time probably seminal, information. His 1982 article, "Information retrieval and the Chinese language," was published in the special volume Essays in Commemoration of the Gold Jubilee of the Fung Ping-shan Library by one of Hong Kong's two leading universities, the University of Hong Kong. A solicited paper, "A new alphameric code for Chinese ideographs," an offshoot of his dissertation, was presented at a conference on computers and Chinese input-output system organized by Taiwan's Academia Sinica, one of the leading research institutes in all of Asia.
Earlier works translated and authored by Dr. Chou are noteworthy, for instance, his master's thesis, a translation into Chinese of T.H. Tsien's important Written on Bamboo and Silk, and his doctoral dissertation, which was a pioneering effort at Chinese character coding.
We note that Dr. Chou's contributions, with the exception of a book review, have been almost wholly in the international area, rather than in the United States. Thus the impact of his work is probably felt more strongly in Taiwan than in this country. His thesis, while of value in exploring the then unplotted territory of Chinese character coding, was not adopted or adapted by either of the major bibliographic networks in this country (RLIN or OCLC) or any library database abroad. Nevertheless, it should be pointed out that Chou has chosen to conduct research in an area little understood by most East Asian librarians.
As mentioned above, Dr. Chou's scholarly activity is above average in volume. However, East Asian librarians who might be considered highly productive may produce one article and publish a conference paper annually; many have also produced monographs or book-length bibliographic works. Moreover, the venue for publications by those at the top of their field might be in refereed journals such as the Journal of Asian Studies, the Harvard Journal of Asiatic Studies or American professional library journals. There is also much activity among East Asian librarians in the production of bibliographic aids, union lists and in acquiring grant funds to enhance their libraries' acquisitions in a certain area, carry on microfilm preservation, conduct retrospective cataloging, etc. Chou's record shows little creative activity of this nature.
Research Accomplishments (Important)
Much of Dr. Chou's research activity continues his interest in the computerization of Chinese ideographs. His articles in the conference proceedings, in the commemorative volume at the University of Hong Kong, and the article in the Journal of Library and Information Science for April 1984 (included but is after the time span ending in 1983) all reflect his building on his earlier work. In terms of library automation, Chou is one of the few East Asian librarians who demonstrates competence in this area. However, the follow-up to his "highly original" dissertation has not resulted in the acceptance of his views in major library networks. In addition, in the traditional areas of bibliographical research, Chou's publications in the 1977-83 period do not show significant accomplishment or contributions. *554 We also note for the record that the inclusion of newspaper articles, short reports in newsletters, and book reviews, though useful, are more appropriate for discussion under general usefulness than under research. An exception might be made for the substantial book review in Library Quarterly, the most prestigious research journal in the library field, though here again this might be cited more appropriate as scholarly and creative activity.
....
Recommendation
The evaluators have had difficulty coming to a conclusion about the appropriateness of promoting Dr. Chou to the rank of professor as of July 1, 1983. We are uncertain about the comparability of his record with that of other librarians in a similar position at Rutgers five years ago, or indeed of librarians at other universities during the late seventies and early eighties. Unquestionably the standards for promotion and tenure were strengthened during that period. In a profession where research and publication have traditionally been less important than excellent library service and collection building, as well as involvement in professional associations, Nelson Chou has published more, given more papers at international conferences, and advanced intercultural information in areas of his interests. That he merits an associate professorship and tenure, which he now holds, we would certainly concur with. However, promotion to the rank of professor is normally reserved for those who are unquestionably recognized nationally for their research and publication. Neither of the outside reviewers believes that, despite his strong record, Dr. Chou is in that category. We recognize that Chou's peers may view his on-campus performance as sufficiently outstanding to overrule our judgment. Nonetheless, based on the information we examined and our knowledge of the library profession in this country, we cannot conscientiously recommend promotion to the rank of professor.
The specially constituted P.R.C.'s report declining to recommend Chou's promotion to Librarian I substantially relied upon the evaluation of these outside consultants, stating:
Our assessment of the packet which leads to this recommendation is summarized as follows:
....

Professional Effectiveness (Major Significance). The record amply documents the value to faculty and students in the University of the collection for which the candidate has responsibility. The professional quality of this contribution is praised by his peers in the University, especially in relation to the limitations on resources with which he has had to contend. While the local value of this collection is clearly established, the record does not provide a basis for comparison of the accomplishment to the work of librarians in similar positions at other universities.

Scholarly and Creative Activity (Major Significance). The candidate's peers find that he has maintained a commendable level of scholarly activity over the years including contributions based on his theses, in translations of literary and technical material and/or other professional subjects. Evidence is absent of significant *555 impact from or recognition of this work in this country. While his early work on character coding is assessed as pioneering, there is no indication that it has had significant impact on the field through adoption by any of the major bibliographic databases in this country or abroad.

Research Accomplishment (Important). While the record shows that the candidate has sustained his earlier interest in the field of his doctoral dissertation, his publications in the period in review (1977-83) do not demonstrate significant contributions to the development of the profession or to the practice of scholarship in the disciplines his library serves.

Professional Activity (Important). The record shows sustained professional activity, mainly in the internationally oriented organizations appropriate to the candidate's specialization. Assessments note that these activities have not included the number and kind of leadership roles typically associated with his seniority.

General Usefulness (Important). The candidate's peers are appreciative of useful services contributed to the Library's functions and to services for students.
In the two categories of major significance assessed in this packet, one is strong and the other is weak. The candidate's professional effectiveness has conferred on the University a valued collection which serves students and faculty users well. The assessments of his scholarly and creative activity, however, do not demonstrate the sustained professional growth and the recognition for important contributions to the practice of the profession associated with the rank of Librarian I. In the Committee's judgment, the balance here is clear: the collection, while valuable is not so singular an accomplishment as to counterbalance the record in scholarly and creative activity.
Although the special internal review procedure that Rutgers established in 1988 to re-evaluate Chou's promotion application, which reaffirmed the decisions of the three prior P.R.C.s that had declined to recommend promotion, did not foreclose the Division from reviewing the entire record to determine whether Chou had been subjected to retaliation or discrimination, this review should have made the Division particularly hesitant to second-guess the judgment of professional educators that Chou's promotion packet did not merit his promotion to the position of Librarian I. Instead, the Director essentially ignored the specially constituted P.R.C.'s decision, while assigning unwarranted significance to the decisions of the two union grievance committees. As a result, the Director substituted his judgment as to whether Dr. Chou merited promotion to the position of Librarian I for the judgment of professionals who not only were far better qualified than the Director to evaluate Chou's scholarly and creative activity and research accomplishments but also had no possible retaliatory or *556 discriminatory motivation for their evaluations. Therefore, we conclude that Chou failed to present substantial credible evidence that there was a causal connection between either his 1975 civil rights complaint or his national origin, ancestry and race, and the denial of his application for promotion to the position of Librarian I.
Accordingly, the Director's decision that Rutgers denied Chou's application for promotion in retaliation for his 1975 civil rights complaint and because of his national origin, ancestry and race, and the relief ordered to implement that decision, are reversed.
NOTES
[1] Librarians at Rutgers have corresponding faculty rank. The position of Librarian II acquired by Chou in 1977 is the equivalent of Associate Professor and the position of Librarian I to which he sought promotion is the equivalent of full Professor.
[2] Although the President may recommend the promotion of a faculty member who has not been recommended by the P.R.C., such a recommendation is fairly uncommon and was not made in Chou's case.
[3] We note, however, that the award of $150,000 for "pain and humiliation" is inconsistent with the view we expressed in Maczik v. Gilford Park Yacht Club, 271 N.J. Super. 439, 448 n. 3, 638 A.2d 1322 (App.Div.), certif. denied, 138 N.J. 263, 649 A.2d 1284 (1994) that an award of $10,000 "approach[es], if [it is] not at, the limit of an `incidental' award." See Zahorian v. Russell Fitt Real Estate Agency, 62 N.J. 399, 410-16, 301 A.2d 754 (1973).
[4] Rutgers argues that the ALJ erred in even admitting evidence of these administrative actions because the Director's predecessor found no probable cause to believe that those actions were retaliatory or discriminatory. However, we have considered this evidence together with all the other evidence in the record in concluding that there is a lack of substantial credible evidence to support the Director's conclusion that Rutgers' denial of Chou's promotion application was retaliatory and discriminatory. Consequently, we have no need to decide whether this evidence should have been excluded on the basis of the prior Director's findings.
[5] Dora Chen subsequently was promoted to Librarian II with tenure on Edelman's positive recommendation.
[6] As previously noted, the seven voting members of the P.R.C. are the three provosts of the New Brunswick, Newark and Camden campuses of Rutgers, who are the chief academic officers at these campuses, and four distinguished faculty members appointed to four-year terms by the President.