731 A.2d 35

IN THE MATTER OF EVA TAYLOR.

Argued March 29, 1999—Decided June 29, 1999.

648

*Michael J. Haas,* Assistant Attorney General, argued the cause for appellants Department of Human Services and Department of Personnel (*Peter Verniero,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel).

*Joseph J. Bell, Jr.,* argued the cause for respondent, Eva Taylor (*Joseph J. Bell & Associates,* attorneys).

PER CURIAM.

The issue in this appeal is whether this Court should sustain an order issued by the Merit System Board that terminated an employee of a State psychiatric hospital for physical abuse of a patient. That inquiry requires us to determine whether the Appellate Division applied the proper standard when it reviewed the factual findings of the Administrative Law Judge (ALJ) on which the Merit System Board (Board) relied in issuing its order. We also address the legal conclusion of the ALJ and the Board that the employee's conduct constituted patient abuse mandating her removal.

I

Respondent Eva Taylor was employed for more than fifteen years at the Greystone Park Psychiatric Hospital (Greystone), a facility run by the New Jersey Department of Human Services (DHS). Taylor began working at Greystone as a food service worker in 1980, and in 1991 she was transferred within the hospital to the direct care department where she served as a human services technician. On November 29, 1995, Taylor was suspended without pay for physically abusing a patient, conduct officially proscribed by DHS Administrative Order 4:08–C.3. On January 5, 1996, after an administrative hearing, Taylor was permanently removed from her job at Greystone. Prior to the incident under review, Taylor had an unblemished disciplinary record.

Taylor's termination resulted from an incident that occurred on November 11, 1995, the facts concerning which are sharply disputed. On that day, Taylor was working the day shift and around 3:30 p.m. was assisting the nurses in dispensing medication to the patients. While waiting in the medication dispensation line, two female patients, B.M. and E.S., began to argue and Taylor attempted to separate them. Taylor had difficulty calming B.M., who continued to argue with E.S. Concerned that B.M. would

become aggressive, Taylor called for the help of Anna Samji, a registered nurse.

### 1. *Taylor's Testimony*

At the hearing conducted by the ALJ, Taylor testified that Samji did not immediately respond to her request for help. Because B.M. was becoming increasingly agitated, Taylor went to the nurses' station. She opened the door of the station with her key, found Samji reviewing patients' charts, and told Samji about the altercation. Without responding to Taylor, Samji walked out of the nurses' station, ordered Georgia Edwards, a licensed practical nurse, to give B.M. an injection of a tranquilizer, and directed Taylor to take B.M. into the medication room for the injection. B.M., uncooperative and refusing to go into the medication room, grabbed Taylor by the collar of her shirt and would not let go. Although Taylor grabbed B.M.'s wrists, as she was trained to do with an aggressive patient, Taylor was unable to remove B.M.'s hands from her collar. Linda Wright, a human services technician, helped Taylor get B.M., who continued to hold onto Taylor's collar, into a chair in the medication room.

Once B.M. was seated in the medication room, Wright was able to release Taylor from B.M.'s grasp. When asked whether she recalled whether the door to the medication room was open or closed, Taylor stated that she did not recall, noting that

[Y]ou can't afford to take your eye off the patient and worry about this door here. Your first concern is, make sure that [the patient] doesn't do anything to hurt herself, make sure that you don't do anything to hurt her, nor let her hurt you. So you have to keep your head back, your arms have to be out, because [the patients] will head butt you.

Taylor left the medication room before an injection was administered.

### 2. *Samji's Testimony*

Samji's testimony is in stark contrast to Taylor's. According to Samji, she was in the nurses' station reviewing patients' medical charts when she heard Taylor call for her assistance. Samji left

the nurses' station, determined that B.M. was agitated and needed some medication to "calm her down," and ordered Edwards to give B.M. an injection of a tranquilizer. Samji went to check B.M.'s chart, which was at the nurses' station, and then returned to the medication room. There, Samji observed over the half door enclosing the medication room B.M.

> sitting on a chair in the medication room and Eva Taylor was hitting her. And Edwards was standing on this side, holding on the medication cart, and one hand on her like this and she was standing and watching the scene.
>
> . . . .
>
> [Taylor] was hitting—she was hitting [with] both her hands, clenched fist. Was going up and down on her. She was standing like this in front of the patient, the patient was sitting on the chair, and the patient was not seen, because she was covering her almost, and I never saw any movement of the patient's hand or anything. I only saw this going on, up and down, on the patient.

Samji opened the half door, told Taylor to stop hitting B.M., and unsuccessfully tried to pull Taylor, described as "big" and "tall" by Samji, away from B.M. Wright eventually came in and separated Taylor from B.M.

Once Taylor and B.M. were separated, Samji turned her attention to other patients who had been waiting outside the medication room, some of whom had become upset as a result of the incident between Taylor and B.M. When Samji returned to the medication room, she was unable to get in because the door was closed and locked. She knocked, but no one opened the door. Eventually, B.M. came out and told Samji, "Anna, Eva [Taylor] hit me."

Before her shift was over, Samji wrote an incident report regarding the altercation between B.M. and E.S.; she did not state in that report that Taylor had hit B.M. Samji called her supervisor, Theodore Bryant, to report the altercation between E.S. and B.M. and the alleged abuse by Taylor. Bryant refused to take her call because it was the end of his shift, and instead gave the phone to the night-shift supervisor. Although Samji reported the patient-to-patient altercation to the night-shift supervisor, Samji believed that the incident involving Taylor was a sensitive issue that should be discussed only with her immediate

supervisor. Samji therefore waited until the following day to report that incident to Bryant.

### 3. *Other Witnesses' Testimony*

Bryant, Edwards, and Wright provided testimony at the hearing that substantially comported with that of Taylor. Bryant, a registered nurse and Supervisor of Patient Services, testified that on November 11, 1995, he was working the day shift and received a phone call from Samji around 4:20, after his shift had ended. When Samji began explaining that there had been an altercation, Bryant handed the phone to the night-shift supervisor. The following day Samji told Bryant that she needed to speak with him. Bryant and Samji met in private, and Samji told Bryant that B.M. had grabbed and struck Taylor but that Taylor had struck B.M. back.

Although Bryant asked Samji to write a report on the incident, Bryant testified that he conducted his own investigation of the incident. He first questioned Taylor, who appeared "dumbfounded" when he informed her of the allegations against her. He then spoke to B.M., who recalled her altercation with E.S. but denied having been struck by a staff member. Bryant also spoke to every employee on the ward during the day shift, including Edwards and Wright, and no one corroborated Samji's version of the events and allegation of abuse.

Nurse Edwards testified that, at approximately 3:30, Samji asked her to administer an injection to B.M., who had been involved in an altercation with another patient and who appeared to be "out of control." Taylor and Wright brought B.M. into the medication room and assisted Edwards in administering the injection because B.M. was resisting and would not sit still. Edwards denied seeing Taylor hit B.M., but she acknowledged that her back was to the patient while she prepared the injection. Additionally, although Edwards saw Samji come into the medication room, she did not see Samji touch Taylor or hear Samji speak to Taylor.

When asked whether the door to the medication room was closed, Edwards testified that in the interest of the patient's privacy she usually closes the door when medication is being administered. Edwards recalled that the door was closed when she administered the injection to B.M., that she heard a knock on the door while she was taking care of the patient, and that she told the person at the door to wait "just a minute." Before she opened the door Edwards finished administering the injection, recorded the injection according to protocol, and washed her hands.

Wright testified that she responded to Taylor's request for help in separating B.M. and E.S. As Wright and Taylor tried to move B.M. into the medication room, B.M. grabbed Taylor by the collar. Wright tried to calm B.M. down and was eventually able to remove B.M.'s hands from Taylor's collar. Wright did not see Taylor strike B.M., did not see Samji in the medication room, and did not notice whether the medication room door was open or closed.

During the hearing, both Taylor and Samji were questioned about their working relationship. Samji testified that she had had some minor differences with Taylor, such as insubordination, but that their differences were not significant. Taylor testified that she and Samji had "had disagreements" but that she was not sure she would describe their relationship as tainted by "bad blood."

Although two doctors examined B.M., one forty minutes after the alleged altercation with Taylor and one the following day, no bruises or other injuries were found. Nevertheless, on November 29, 1995, DHS suspended Taylor without pay for physically abusing a patient, conduct officially proscribed in DHS Administrative Order 4:08–C.3 ("Physical or mental abuse of a patient, client, resident, or employee"). Physical or mental abuse is defined in the Administrative Order as "a malicious act directed toward a patient, resident, client, or employee with the intent to cause pain, injury, suffering or anguish." Under the Administrative Order, an

employee must be removed from employment after the employee's first infraction.

Taylor requested and was given a hearing by DHS, and the hearing officer sustained the charges of physical abuse. On receipt of a Final Notice of Disciplinary Action that informed Taylor of her permanent suspension from her job at Greystone, Taylor filed a timely appeal with the Merit System Board which referred the matter to the Office of Administrative Law for a hearing.

After a hearing before the ALJ, the ALJ determined that Taylor had physically abused B.M., thereby sustaining Taylor's permanent suspension. In a written decision, the ALJ found Samji's version of events more credible than Taylor's or the other witnesses'. Specifically, the ALJ concluded:

> Based ... upon my review and consideration of the testimony, the documentary evidence and my intuition and experience, I am compelled to conclude that despite the greater number of witnesses who either denied or could not corroborate the version of the alleged incident offered by Sa[m]ji, her credibility outweighed that of Taylor and the others and in my judgment did establish the truth of the charge against Taylor by a preponderance of the evidence. Although there were intimations of previous problems between Sa[m]ji and Taylor, having had the opportunity closely to observe Sa[m]ji's demeanor during the course of her testimony, I believe that her version of the events [has] the greater "ring of truth" to it. No viable reason was apparent, nor was any offered, to support the assertion that Sa[m]ji would concoct her version of the incident simply in order to falsely harm Taylor. Sa[m]ji had nothing to gain by doing so and perhaps much to lose in terms of exacerbating her relationships with persons with and for whom she worked. It is most unlikely that this registered nurse, having testified as she did, was not telling me the truth. She was unshaken with respect to her version of what she observed and her testimony essentially corroborated exactly what she contemporaneously had put down both in her report ... and her written statement.... While it is not uncommon for individual observations of the same incident to vary, what happened here cannot be explained that way. Sa[m]ji *was* there and she credibly related that she *did* see Taylor hit B.M.

The Merit System Board adopted the ALJ's findings of fact and conclusions of law, and thus affirmed Taylor's termination.

Taylor filed an appeal with the Appellate Division. In an unpublished, *per curiam* opinion, the Appellate Division reversed and remanded the matter to the ALJ for reconsideration. The court held that the ALJ provided an "insufficient explanation for

his conclusion that petitioner abused the patient" and concluded that "[a]fter carefully reviewing the evidence, and in light of the severity of the disciplinary action taken, ... only limited deference [to the ALJ's findings of fact] is warranted in this case."

In so holding, the Appellate Division questioned the ALJ's "total reliance on Samji's testimony, when she herself testified that her view of the patient in the medication room was obstructed by Taylor's person," and noted that "[i]f the patient had been struck repeatedly with a clenched fist on her head and shoulders by a person who apparently towered over her, one has to wonder why no sign of injury appeared." The court concluded that "what appeared to [Samji] to be a serious assault was at most an inappropriate physical contact," defined and proscribed by Administrative Order 4.08–C.5. The court held that, on remand, the ALJ must "further explain his determination with respect to the credibility of the witnesses" and not impose a penalty greater than that provided in Administrative Order 4:08–C.5.

We granted DHS's petition for certification. 156 *N.J.* 427, 719 *A.*2d 1025 (1998).

II

■ Under the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –24, an ALJ, who has been assigned to review a disputed matter involving a State agency, is charged with issuing a decision that contains recommended findings of fact and conclusions of law that are "based upon sufficient, competent, and credible evidence." *N.J.S.A.* 52:14B–10(c); *see also Clowes v. Terminix Int'l, Inc.,* 109 *N.J.* 575, 586–89, 538 *A.*2d 794 (1988) (citing *N.J.S.A.* 52:14B–10(c) and explaining relationship between decision of ALJ and final decision of agency). Although the agency may adopt, reject or modify the ALJ's findings, the decision of the ALJ will be deemed adopted as the final decision of the agency unless the agency modifies or rejects the report within forty-five days of its receipt. *N.J.S.A.* 52:14B–10(c). In this proceeding the Merit System

Board issued an Order that affirmatively adopted the findings of fact and conclusions of law made by the ALJ.

Once the agency has issued its final decision, "the Appellate Division's initial review of that decision is a limited one." *Clowes, supra,* 109 *N.J.* at 587, 538 *A.*2d 794; *see also Brady v. Board of Review,* 152 *N.J.* 197, 210, 704 *A.*2d 547 (1997) ("The judicial capacity to review administrative agency decisions is limited."); *Goodman v. London Metals Exch., Inc.,* 86 *N.J.* 19, 28, 429 *A.*2d 341 (1981) (holding that "appellate review of an administrative agency's factual determinations is circumscribed"). The scope of review of an administrative decision "is the same as that [for] an appeal in any nonjury case, *i.e.,* 'whether the findings made could reasonably have been reached on sufficient credible evidence present in the record' considering 'the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility." *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965) (quoting *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964)).

Under that standard, the scope of judicial review of an agency's decision is restricted to four inquiries:

(1) whether the agency's decision offends the State or Federal Constitution;

(2) whether the agency's action violates express or implied legislative policies;

(3) whether the record contains substantial evidence to support the findings on which the agency based its action; and

(4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[*Brady, supra,* 152 *N.J.* at 210–11, 704 *A.*2d 547 (quoting *George Harms Constr. Co. v. New Jersey Turnpike Auth.,* 137 *N.J.* 8, 27, 644 *A.*2d 76 (1994)).]

Additionally, as we recently stated in *State v. Locurto,* 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999), an appellate court may not "engage in an independent assessment of the evidence as if it were the court of first instance." We frequently have observed that findings of fact made by a trial judge "are considered binding on appeal when supported by adequate, substantial and credible evidence," *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.*

474, 484, 323 *A*.2d 495 (1974), and that standard is equally applicable to reviews of administrative decisions, see *Close, supra,* 44 *N.J.* at 599, 210 *A*.2d 753 (holding that scope of review of administrative decision "is the same as that [for] an appeal in any nonjury case").

Accordingly, if in reviewing an agency decision an appellate court finds sufficient credible evidence in the record to support the agency's conclusions, that court must uphold those findings even if the court believes that it would have reached a different result. *Clowes, supra,* 109 *N.J.* at 588, 538 *A*.2d 794; *Goodman, supra,* 86 *N.J.* at 28–29, 429 *A*.2d 341. "[A]n appellate court will reverse the decision of the administrative agency only if it is arbitrary, capricious or unreasonable or it is not supported by substantial credible evidence in the record as a whole." *Henry v. Rahway State Prison,* 81 *N.J.* 571, 581, 410 *A*.2d 686 (1980); *see also Brady, supra,* 152 *N.J.* at 210, 704 *A*.2d 547 ("Unless a[c]ourt finds that the agency's action was arbitrary, capricious, or unreasonable, the agency's ruling should not be disturbed."). If the appellate court determines that the findings made below are arbitrary, capricious and unreasonable, "then, and only then, [the appellate court] should appraise the record as if it were deciding the matter at inception and make its own findings and conclusions." *Johnson, supra,* 42 *N.J.* at 162, 199 *A*.2d 809.

We note that although the scope of review of an agency's decision is circumscribed, an appellate court's review of an agency decision is "not simply a *pro forma* exercise in which [the court] rubber stamp[s] findings that are not reasonably supported by the evidence." *Chou v. Rutgers,* 283 *N.J.Super.* 524, 539, 662 *A*.2d 986 (App.Div.1995), *certif. denied,* 145 *N.J.* 374, 678 *A*.2d 714 (1996); *see also Costantino v. New Jersey Merit Sys. Bd.,* 313 *N.J.Super.* 212, 225, 712 *A*.2d 1158 (App.Div.1998) (noting that Appellate Division does not engage in *"pro. forma "* review of agency decisions and "need not defer to an agency decision that is manifestly mistaken"), *certif. denied,* 157 *N.J.* 544, 724 *A*.2d 803 (1998). Appellate courts must engage in a "careful and principled

consideration of the agency record and findings." *Mayflower Sec. Co. v. Bureau of Sec.,* 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973). Furthermore, "[a]n appellate tribunal is ... in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." *Ibid.*

When this Court "is called upon to review the action of the Appellate Division in passing upon a claim that the trial court's fact findings were wrong," we must first determine whether the Appellate Division applied the proper standard of review, *Johnson, supra,* 42 *N.J.* at 163, 199 *A.*2d 809, *i.e.,* whether the Appellate Division engaged in a determination of whether the findings made could reasonably have been reached on sufficient credible evidence, *id.* at 162, 199 *A.*2d 809. If we determine that the Appellate Division did not apply the appropriate standard of review and that "the Appellate Division ... was manifestly mistaken in concluding that the trial court had gone too wide of the mark," we must then "treat the case as the intermediate tribunal should have." *Id.* at 163, 199 *A.*2d 809. That inquiry requires us to determine whether the agency's decision could reasonably have been reached on sufficient credible evidence present in the record. *Close, supra,* 44 *N.J.* at 599, 210 *A.*2d 753. If we determine that the decision of the agency is arbitrary, capricious, or unreasonable or that it is not supported by substantial credible evidence, we must then "appraise the record as if ... deciding the matter at inception and make [our] own findings and conclusions." *Clowes, supra,* 109 *N.J.* at 588, 538 *A.*2d 794 (quoting *Johnson, supra,* 42 *N.J.* at 162, 199 *A.*2d 809).

### III

We first consider whether the Appellate Division below applied the appropriate standard of review. *Johnson, supra,* 42 *N.J.* at 163, 199 *A.*2d 809. That inquiry requires us to determine whether the Appellate Division considered "whether the findings made could reasonably have been reached on sufficient credible evi-

dence." *Id.* at 162, 199 *A.*2d 809. We conclude that the Appellate Division failed to make that determination.

■ Specifically, the Appellate Division exceeded the proper scope of review by failing to give appropriate deference to the ALJ's findings of fact and by substituting its own assessment of the weight to be accorded to the testimony of the witnesses. See *Clowes, supra,* 109 *N.J.* at 587, 538 *A.*2d 794 ("[T]he reviewing court should give 'due regard to the opportunity of the one who heard the witnesses to judge of their credibility.'") (quoting *Close, supra,* 44 *N.J.* at 599, 210 *A.*2d 753); *Goodman, supra,* 86 *N.J.* at 28–29, 429 *A.*2d 341 ("Though an independent *de novo* examination of the record might lead a reviewing court to an opposite conclusion, [an appellate] court's obligation is to examine the record in order to determine whether the evidence and the reasonable inferences to be drawn therefrom could reasonably support the decision."). The court below stated that "only limited deference is warranted in this case," thereby "question[ing] the judge's total reliance on Samji's testimony." The proper inquiry, however, was whether Samji's testimony alone was a sufficiently credible basis on which to conclude that Taylor had engaged in the conduct with which she was charged. Thus, we find that the court did not focus on the issue of whether "the findings made could reasonably have been reached on sufficient credible evidence." *Close, supra,* 44 *N.J.* at 599, 210 *A.*2d 753. Because we find that the Appellate Division failed to apply the proper standard of review, we must "treat the case as [the Appellate Division] should have." *Johnson, supra,* 42 *N.J.* at 163, 199 *A.*2d 809.

■ We conclude that there was sufficient credible evidence to support the ALJ's findings of fact and that the Appellate Division erroneously found that the ALJ provided "insufficient explanation for his conclusion that [Taylor] abused the patient." As recently explained in *Locurto, supra,* credibility findings need not be explicitly enunciated if the record as a whole makes the findings clear. 157 *N.J.* at 474, 724 *A.*2d 234. We find that the ALJ's explanation of his ruling adequately supports his factual

findings. Furthermore, the ALJ made specific findings about Samji's credibility. For example, the ALJ found that Samji's version of the events had a "greater 'ring of truth,' " that Samji was consistent in her version of events, and that Samji had no motive to fabricate the incident.

"[T]rial courts' credibility findings . . . are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." *Locurto, supra,* 157 *N.J.* at 474, 724 *A.*2d 234. Observing that of all the witnesses who testified Samji was the most credible, the ALJ determined that Taylor did strike B.M. We find that determination to be adequately supported by evidence in the record and accordingly sustain it.

Our conclusion that the ALJ's factual findings must be upheld does not end our inquiry. We also consider whether the evidence supports the ALJ's legal conclusion that Taylor's conduct constituted "abuse" as defined by DHS, in order to support the sanction of permanent removal from employment. See *N.J.S.A.* 52:14B–10(c) ("A recommended report and decision [shall] contain findings of fact and conclusions of law . . . ."). Our review of that determination is *de novo. See Mayflower Sec. Co., supra,* 64 *N.J.* at 93, 312 *A.*2d 497 (holding that appellate court is not "bound by the agency's interpretation of a statute or its determination of a strictly legal issue").

We are unpersuaded that the ALJ's conclusion of law—that Taylor physically "abused" a patient—is a correct one. The ALJ found Taylor committed patient abuse in violation of Administrative Order 4:08–C.3. That provision defines physical abuse as "a malicious act directed toward a patient, resident, client, or employee with the intent to cause pain, injury, suffering or anguish." The mandatory sanction for such an infraction is removal. However, the ALJ did not consider whether Taylor's conduct was more properly characterized as "inappropriate physical conduct" as defined by Administrative Order 4:08–C.5, which provides that "[i]nappropriate physical contact or mistreatment of a patient," for

which there is no intent requirement, carries a mandatory sanction of an oral reprimand or removal.

 While crediting the factual findings of the ALJ, we note that this matter involved highly conflicting testimony, much of which corroborated Taylor's version of events. We believe that on this record the evidence was insufficient to support the ALJ's legal conclusion that Taylor committed patient abuse. That Samji's view of the incident was obstructed is not disputed, nor is it disputed that the patient grabbed Taylor and had to be separated from her. The ALJ made no finding that Taylor acted maliciously toward B.M., nor did he conclude that Taylor intended to cause B.M. pain, injury, or anguish. The evidence established that B.M. did not suffer any physical injury and that she did not recall being hit by Taylor. We do not sustain the ALJ's legal conclusion that Taylor engaged in physical abuse of a patient as defined by Administrative Order 4:08–C.3. On this record, we are satisfied that Taylor's conduct constituted "inappropriate physical contact" within the meaning of Administrative Order 4:08–C.5 and that removal would be an excessive sanction. *Accord Harcum v. New Lisbon Dev. Ctr.,* 96 *N.J.A.R.*2d (CSV) 324, 1996 WL 433210 (1996) (reducing physical abuse charge to charge of inappropriate physical contact because employee did not act with malice and patient was not injured); *Lyew v. Morris View Nursing Home,* 93 *N.J.A.R.*2d (CSV) 673, 1993 WL 470770, *aff'd,* 94 *N.J.A.R.*2d (CSV) 718, 1994 WL 757555 (App.Div.1994) (holding that sanction of removal for nursing home attendant, who was found to have hit patient suffering from dementia, should be reduced to penalty of six-month suspension, because act of hitting patient was "isolated instance" in which patient was aggressor).

## IV

We acknowledge the responsibility of DHS to ensure that vulnerable patients in their care are shielded from any form of abuse by their caretakers. Balanced against that concern, however, we also must ensure that the rights of public employees who

work under extremely difficult conditions also are protected. Accordingly, we reject the ALJ's legal conclusion, and the Merit System Board's adoption thereof, that Taylor committed patient abuse and that she must be removed from her position at Greystone. We find that the evidence established that Taylor committed "inappropriate physical contact or mistreatment of a patient" as set forth in Administrative Order 4:08–C.5. We modify the judgment of the Appellate Division and remand the matter to the Merit System Board to determine the appropriate sanction and for further proceedings consistent with this opinion.

*For modification and remandment*—Chief Justice PORITZ and Justices HANDLER POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.