802 A.2d 581 (2002)
353 N.J. Super. 310
In the Matter of AMENDMENT TO RECREATION AND OPEN SPACE INVENTORY OF THE CITY OF PLAINFIELD to Remove Park-Madison Site, Block 246, Lot 1.
Superior Court of New Jersey, Appellate Division.
Argued May 29, 2002.
Decided July 18, 2002.
*583 Ann Alexander argued the cause for appellants Children and Friends for Equitable Stewardship (CAFES) and the Sierra Club-New Jersey Chapter (Rutgers Environmental Law Clinic, attorneys; Ms. Alexander, on the brief).
Rachel Horowitz argued the cause for respondent New Jersey Department of Environmental Protection (David Samson, Attorney General, attorney; Nancy Kaplen, Assistant Attorney General, of counsel; Ms. Horowitz, Deputy Attorney General, on the brief).
Joseph J. Maraziti argued the cause for respondent City of Plainfield (Maraziti, Falcon & Healey, attorneys; Mr. Maraziti, of counsel; Brent T. Carney, on the brief).
Jeffrey J. Miller argued the cause for respondent (DeCotiis, Fitzpatrick, Gluck & Cole, attorneys; Mr. Miller, on the brief).
Before Judges SKILLMAN, WALLACE, JR. and WELLS.
*582 The opinion of the court was delivered by WELLS, J.A.D.
Children and Friends for Equitable Stewardship (CAFES), a City of Plainfield citizens group, and the Sierra ClubNew Jersey Chapter represented by the Rutgers Environmental Law Clinic, appeal from a final decision of the Commissioner of the Department of Environmental Protection (DEP) which permitted the City of Plainfield to remove from its 1992 Green Acres Recreation and Open Space Inventory (ROSI) a four acre parcel of land which had been developed into a public park in 1991-1992. This action cleared the title of the parcel of any restriction against the use of the park for purposes of commercial development. We granted a stay of the decision pending appeal and ordered an accelerated scheduling. On May 17, 2002, Plainfield filed a motion to supplement the record, or in the alternative, strike portions of CAFES' appendix. We reserved decision and now deny the motion.
In Part I of this opinion, we describe the underlying facts and procedural history which brings the case to us; in Part II, we outline the applicable law which frames the issues to be decided; in part III, we analyze the Commissioner's ruling and state the issues on appeal; finally, in Part IV we decide the appeal.

I
The parcel of land which is the subject of the appeal is known throughout most of the record before us as the Park-Madison site for the names of the two avenues which bound it, Park Avenue and Madison Avenue. It is four acres in size, described as Block 246, Lot 1, on Plainfield's tax map, and lies within its central business district.
Park-Madison has a forty-year history in Plainfield. On September 21, 1959, pursuant to former N.J.S.A. 40:55-21.1 to -21.14[1], Plainfield's Common Council declared Park-Madison "blighted" and, by resolution, authorized Plainfield's Housing Authority to seek federal funding for an urban renewal project on it. The 1959 Resolution stated that the Common Council "determines that the redevelopment of the project area, [Park-Madison] ..., for predominately non-residential uses is necessary for the proper development of the community." *584 In June 1962, the Madison Park Renewal Plan was adopted. The Plan described the permitted uses for Park-Madison as
retail sales, personal and business service establishments, offices, restaurants or other places serving food or drink, off-street parking and loading facilities, and appurtenant landscaping.
Between 1962 and 1969, despite potential tenants, redevelopment of Park-Madison did not occur. In 1970, a "Disposition Study" was prepared in order to assist the Housing Authority in selecting from various redevelopers. The study concluded that:
Commercial use would be most compatible with the surroundings of the Madison-Park Urban Renewal Area's location in the Central Business District. Imaginative development of these uses will help rather than harm Plainfield's existing retail and service facilities....
Office space is the key to Commercial development in the Madison-Park project area. There is not enough demand for office space generated in Plainfield to sustain any sizeable development. The feasibility of this use depends on the developers['] ability to attract first rate tenants.
In 1976, a marketing package for Park-Madison was drafted. The package revealed that the vision for it was extensive commercial redevelopment, including two office buildings, a retail mall, a 650 car parking garage, and a mid-rise motor hotel. Despite clearing Park-Madison, redevelopment did not occur at that time.
In 1978, Plainfield assumed control over redevelopment of Park-Madison from the Housing Authority, and title to the property was transferred to Plainfield. On September 4, 1979, it adopted a resolution designating a redeveloper. However, as before, this did not result in the redevelopment of Park-Madison.
Due to the failed attempts at commercial redevelopment, in 1987 Plainfield's Redevelopment Agency issued a Request for Proposal ("RFP") for the "redevelopment and construction" of Park-Madison. At least two developers submitted responses to that RFP. However, the site still remained undeveloped.
In June 1989, upon the recommendation by the City's Planning Board, the City Council reaffirmed Park-Madison's 1962 declaration of blight. Thereafter, in August 1989, the Planning Board adopted a resolution approving a new redevelopment plan for Park-Madison. Around the same time, pursuant to N.J.S.A. 13:8A-35 to -55, Plainfield received $425,000 in Green Acres funds to create the Milton Campbell Recreation Area. In connection with receipt of those funds, Plainfield submitted a ROSI, in which it listed all "recreation and open space land." Park-Madison was not listed on the 1989 ROSI.
In July 1990, pursuant to N.J.S.A. 52:27H-60 to -88[2], Plainfield planned to upgrade Park-Madison by applying for Urban Enterprise Zone (UEZ) funds. It also sought UEZ funds to conduct an environmental study for Park-Madison. Plainfield's request for UEZ funds stated:
The development of the Park-Madison site is and will remain a priority in the economic revitalization efforts of the City. The Plainfield Redevelopment Agency and the Office of Economic Development are designing strategies to meet and bring potential developers to *585 the site and encourage their participation in development. However, the approval process, as identified, would require a minimum of two years. The site would remain in this condition for this amount of time, instilling the feeling of doubt in the City of Plainfield's business community....
In order to ensure the continued viability of the business community and to instill pride in the overall community, it is proposed that a plan be developed to upgrade the Park-Madison site.
On July 12, 1990, the UEZ Authority approved Plainfield's applications, and provided it with $5,000 to obtain a conceptual design to upgrade Park-Madison and $15,000 to conduct an environmental study.
On December 12, 1990, Plainfield submitted a third UEZ application requesting $328,000 to implement upgrades to Park-Madison pending redevelopment. The application stated:
The physical development of the Park-Madison site as [a] modern retail, commercial or residential center is top priority in the economic revitalization efforts of the City. The Office of Economic Development and the Plainfield Redevelopment Agency are designing strategies to meet and bring potential developers to this downtown redevelopment area and encourage their participation in our city's revitalization. However, given the current slump in today's real estate investment market we can not realistically predict when actual development will take place in this area. Our primary focus will be to effect downtown development around the site. However, development of the site will remain an option. Given the significance of this vital downtown site, the City can ill afford to leave it in its current state any longer. To do so, will continue to perpetuate the perception that Plainfield will not tackle major tasks designed to improve our City's image, which is crucial to promoting our existing businesses as well as attracting new businesses and outside investors and developers to our Urban Enterprise Zone.

The application also indicated that "[t]he site has been designed in a manner in which items used to upgrade the site are recyclable for reuse on this site or other such park areas once this site is ultimately developed."
On January 10, 1991, the UEZ Authority approved Plainfield's application. Upon receipt of the UEZ funds, Plainfield upgraded Park-Madison including constructing a gazebo, installing asphalt walkways for jogging and exercise, adding lighting, planting grass, trees, shrubbery and seasonal flowers, upgrading the play area, and landscaping to allow for outdoor events. It was officially opened to the public in May 1992 as a park.
Other documents executed contemporaneously with Park-Madison's upgrade indicate that the upgrade was a temporary measure designed to attract redevelopers. A 1991 Capital Improvement Plan Request for Park-Madison provided:
The Park-Madison area was blighted in 1962 and in the following years the City cleared the site through the now defunct Federal Urban Renewal Program. Subsequent attempts to develop Park-Madison have been unsuccessful. The 4.5 acre tract of land is presently vacant and used primarily as a graveled public parking lot. The condition of the lot does not project a positive view of downtown Plainfield. The downtown "image" has deterred potential developers and patrons.
The Office of Economic Development and the Plainfield Redevelopment Agency is actively seeking developers for the site.

*586 In the meantime, the downtown image must be changed in order to attract people and developers to the center of Plainfield. A step in this direction is upgrading the tract and developing a temporary park on the site for recreation, civic activities and events, such as concerts, art exhibits, and an outside theater.
In addition, the minutes of the City's Planning Board meeting, dated February 6, 1992, reflect that the City's Economic Development Director "stated briefly the history of the Park/Madison parcel and the events that led to its present development as a temporary park."
In September 1992, Plainfield applied to the Green Acres Program for $19,000 to renovate and refurbish two city playgrounds not part of Park-Madison. As it had done in 1989, Plainfield submitted a ROSI to Green Acres that did not originally list Park-Madison. By letter dated November 2, 1992, Green Acres advised them that "this office has been informed of their past plans to develop the `downtown' Park-Madison site and questions whether this area should not also be inventoried as parkland."
By letter dated November 12, 1992, an Assistant Planner from Plainfield responded to the Green Acres letter with a revised ROSI that listed Park-Madison. Her letter stated, "Your inquiry on three of Green Acres assisted acquisition projects, namely, Second Street/Jefferson Avenue, Myrtle Avenue and Berkeley Terrace Parks, and the City's Downtown Park (Park-Madison) are also listed on this inventory form." Thereafter, on December 7, 1992, Green Acres entered into a grant contract with Plainfield, whereby it received a grant of $19,000. In return Plainfield agreed that "[n]o other lands presently owned, dedicated or maintained for recreation or conservation purposes ... shall be diverted to a non-compatible use or disposed of without the approval of [the] Commissioner and State House Commission." In connection with receipt of additional Green Acres funds, Plainfield also submitted ROSIs in 1995, 1996, 1997, 1999, and 2000. None of these ROSIs listed Park-Madison. We note, however, that the record is devoid of any notice to or permission from DEP approving the removal of Park-Madison from the ROSIs for those years.
In the years that followed, Park-Madison became a center of Plainfield's recreational and cultural life with substantial assistance and encouragement from Plainfield. It erected several large signs at the entrance. The largest read "Welcome to Historic Plainfield The Queen City." Another read "Roberto Clemente Memorial Park;" and another, bearing the City of Plainfield logo, read, "Alcoholic beverages, ball playing, bicycles, unleashed pets, skating and unlicensed vendors are prohibited; litter must be placed in receptacles. This facility shall close as sunset. Contact Plainfield City Clerk's office for reservations."
Consistent with this last instruction, Plainfield citizens frequently applied to Plainfield for and were granted permits for large-scale public events. Plainfield's records indicate that between 1992 and 2000, it granted authorizations for, among other things, a Black Family Day Picnic, A Hispanic Arts Festival, an Ethnic Food Festival, the annual Festival for Kids, a "Kiddle Carnival" sponsored by high school students, and pre-parade ceremonies in celebration of Dr. Martin Luther King, Jr.'s birthday. At one point, it paid more than $17,000 to professional event planners to assist with a jazz concert and other events held at Park-Madison. Plainfield also accepted $1,000 per day pursuant to a lease agreement with the Great American Circus for use of Park-Madison.
*587 Meanwhile, Plainfield continued its efforts to redevelop Park-Madison. In July 1997, it issued another RFP for Park-Madison. Though one developer responded, its proposal did not result in a contract for redevelopment. In 1998, Plainfield adopted a new Master Plan. The Plan referred to Park-Madison as a Redevelopment Area and stated:
The master plan continues to recommend mixed use development of the Park-Madison/Teppers Redevelopment Area as the best development option. The plan calls for specific density requirements and seeks to impose design guidelines to promote an attractive development that will enhance the quality of the City's downtown area.
Despite the numerous references to Park-Madison as a Redevelopment Area, when describing its open space inventory, the Plan listed Park-Madison under the heading "Developed and partially developed lands held for recreation and conservation purposes." The Plan's list of open space mirrored that of the 1992 ROSI.
Plainfield's efforts to redevelop Park-Madison continued into 2000. In May 2000, upon the recommendation of the Planning Board and following a public hearing, the City Council again designated it as an area in need of redevelopment under the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 to -49. The City Council directed the Planning Board to prepare a redevelopment plan. The plan was subsequently prepared and adopted by the Planning Board and the City Council. The 2000 Redevelopment Plan provided that:
It is the intent and purpose of this redevelopment plan to transform the vacant subject site into viable commercial properties and return it to the city tax rolls.... The transformation of this vacant site into uses advancing commercial activity and a commercial ratable will serve to greatly enhance the look, activity, and future of the city. It is the goal of this plan to make this transformation a reality.
In July 2000, Plainfield entered into an agreement whereby the Union County Improvement Authority (UCIA) agreed to finance the construction of an office building, two small buildings for retail business, and a parking deck at an estimated cost of $30 million. The project was to be financed through the issuance of $28 million in UCIA revenue bonds. These bonds were to be secured and paid off by lease payments to UCIA by a private developer, AST Development Corporation (AST). AST submitted its preliminary site plan to the City's Planning Board. Following public hearings, the Planning Board approved the plan.
As a result of a title search conducted by AST in 2000, Plainfield learned that Park-Madison was encumbered with Green Acres restrictions due to its inclusion in the 1992 ROSI. Thereafter, it wrote to Green Acres and requested an amendment to the 1992 ROSI excluding Park-Madison from the ROSI pursuant to N.J.A.C. 7:36-20.3. Plainfield explained that it was never intended or designed as parkland, and noted that they had not listed it on the 1995 ROSI or other subsequent or prior ROSIs.
In August 2000, Green Acres informed Plainfield that it supported its position that Park-Madison was not encumbered with Green Acres restrictions. However, following CAFES' objection to its removal from the ROSI, Green Acres requested that Plainfield hold a public hearing under N.J.A.C. 7:36-20.3(d). Around this same time, it authorized the conveyance of Park-Madison to the UCIA.
Plainfield held a public hearing on May 22, 2001. Approximately 21 members of the public testified, and there was majority *588 support for preserving Park-Madison as a park. Plainfield provided Green Acres with copies of the public notices, the transcript of the hearing, and additional documents recovered from their files that were put into the record of the public hearing.
While Plainfield's request to remove Park-Madison was pending, in November 2001 it entered into an agreement with the DEP. Part of the purpose of the agreement was to increase the amount of open space in Plainfield, ensure the inclusion of public open space elements in future redevelopment, and immediately dedicate certain municipally-owned properties as parkland. The lands to be dedicated as open space included five acres located alongside Green Brook, which would form the first component of a greenway.
On January 7, 2002, the Commissioner of the DEP issued a final agency decision affirming Plainfield's position that Park-Madison was not parkland, and, therefore, had been listed in error in 1992 and should not be encumbered with Green Acres restrictions. Analyzing both the relevant statutory provision for amending a ROSI, N.J.A.C. 7:36-20.3, as well as Cedar Cove, Inc. v. Stanzione, 122 N.J. 202, 584 A.2d 784 (1991), the Commissioner ruled that Plainfield had met the criteria required to remove it from the 1992 ROSI. Thereafter, on January 11, 2002, the Commissioner executed a release to remove Park-Madison from the ROSI.

II
The legal framework upon which the above facts must be considered rests upon (1) a statute, N.J.S.A. 13:8A-47b; (2) a Supreme Court case interpreting the statute, Cedar Cove, Inc. v. Stanzione, 122 N.J. 202, 584 A.2d 784 (1991); and, (3) a Green Acres regulation, N.J.A.C. 7:36-20.3, adopted by the DEP in 1998. We begin with a significant provision of the New Jersey Green Acres Land Acquisition and Recreation Opportunities Act, N.J.S.A. 13:8A-35 to -55, (Act):
A local unit which receives a grant under this act shall not dispose of or divert to a use for other than recreation and conservation purposes any lands held by such local unit for such purposes at the time of receipt of said grant without the approval of the commissioner and the State House Commission and following a public hearing by the local unit at least 1 month prior to any such approvals.

[N.J.S.A. 13:8A-47(b).]
This statute was construed by the Supreme Court in Cedar Cove, Inc. v. Stanzione, 122 N.J. 202, 584 A.2d 784 (1991). Because of the centrality of this case to our ultimate disposition, we describe in some detail its pertinent facts. In late 1984, the Borough of South Toms River offered for sale at public auction a parcel of land known as Mathis Plaza. Id. at 206, 584 A.2d 784. The tract had been created by the Army Corp of Engineers in 1927 from fill dredged from a channel in the Toms River. Id. at 207, 584 A.2d 784. Almost immediately, the Borough authorized improvements to the property to facilitate its use as a public park. Ibid.
The Borough purchased the tract from the state in 1935, divided it into 4 lots and leased two of them for commercial purposes. Ibid. It also consistently throughout was "interested in the commercial development of Mathis Plaza and its potential as a source of revenue." Id. at 208, 584 A.2d 784. Nevertheless, as to the remaining two lots, while there was never a formal dedication of the lots as a park, there were "numerous instances of the use of those lots as a public park and recreational facility, undertaken with the approval and support of the Borough over a forty-year period from the purchase in *589 1935 to 1978." Id. at 207-08, 584 A.2d 784.
In 1977, South Toms River applied for a Green Acres' grant to improve a ball field at a separate site. Id. at 207, 584 A.2d 784. In connection with that application, the Borough filed a ROSI. Id. at 208-09, 584 A.2d 784. The Court described the Borough's action, its ROSI and the basic purpose of a ROSI:
As part of its 1977 Green Acres application, the borough was required to complete a DEP form entitled "Recreation and Open Space Inventory," listing two types of properties, "Developed Park and Recreation Areas" and "Undeveloped Lands ... Designated for Open Space, Recreation or Conservation Purposes." The borough did not list any of the Mathis Plaza property on either of the inventories it submitted to the DEP in 1977. According to the DEP, such inventories have regularly been required as part of a grant application, and have been used to determine what properties would be subject to the sale restrictions set forth in DEP regulations and individual local grant contracts. The inventories, along with the final grant agreements, generally have also been filed with the clerk's office for the county in which the relevant properties are located, as constructive notice of the restrictions on their future sale.

[Ibid.]
The Green Acres grant was awarded in 1978. Ibid.
Six years later, however, South Toms River decided to realize on the commercial value of the lots. Id. at 206, 584 A.2d 784. The auction described above proceeded and Stanzione's bid was accepted. Ibid. A neighboring property owner, Cedar Cove, Inc., objected and filed suit. Ibid. Among Cedar Cove's claims was that because Mathis Plaza was in current use as park and recreational land and had been so used for many years, a statutory restriction existed under N.J.S.A. 13:8A-47b forbidding its sale without prior State approval, even though it had never been listed in a ROSI. Id. at 206-07, 584 A.2d 784.
The Law Division acknowledged that the Borough had held Mathis Plaza with an intention of realizing its future economic value through its commercial use. Id. at 209, 584 A.2d 784. Nevertheless, it held that regardless of its intended use, its present use and its use at the time of the Green Acres grant was that of park and open recreational land and, therefore, the restriction bound the Borough. Ibid. We reversed, holding that because there was an insufficient showing of "permanent resolve" to devote the property to park and recreational use to trigger the N.J.S.A. 13:8A-47b restriction, it did not apply. Cedar Cove, Inc. v. Stanzione, 233 N.J.Super. 336, 343, 558 A.2d 1351 (App.Div. 1989).
The Supreme Court granted certification and rejected our reasoning. Cedar Cove, supra, 122 N.J. 202, 216, 584 A.2d 784 (1991). The Court construed the statute expansively:
[E]ven a formal municipal dedication of property to non-Green Acres purposes will not obviate the restriction on its future sale if that property is otherwise actually used for recreational or conservation purposes. Municipal determinations, regardless of form, that do not affect the actual use of properties cannot be dispositive of their character for Green Acres purposes. Thus, in this case, such official municipal determinations, e.g., those reflected in master plans, zoning ordinances, or tax maps, that do not coincide with actual use cannot alone establish the character or nature of properties sufficiently to exempt *590 them from the sales restrictions of the 1975 Act.
....
In sum, the language of the enactment, its statutory history, administrative agency interpretation and practice, and legislative purpose combine to indicate that subsection 47b of the 1975 Act requires State approval for the sale of existing parklands and recreational lands, if the municipality receives Green Acres funding. The underlying policy of Green Acres legislation, i.e., the expansion of lands throughout the state for recreation and conservation, is best served if a property is deemed held by a municipality for recreational or conservation purposes, whenever it has been actually used for such purposes with the condonation or authorization of the municipality. In a given case, such actual, approved use would have to be determined by examination of all relevant facts concerning whether a municipality was aware of such use, whether it supported and encouraged the use, and whether the municipality had taken any official action to allow the property to be used for such purposes. However, in keeping with the caveat that an official municipal declaration cannot in itself be dispositive, even if a municipality appears to have intended such property for commercial development, where such development remains wholly executory, any such intent would not outweigh the property's actual and approved use for recreation or conservation.
[Id. at 214-15, 217-18, 584 A.2d 784.]
The last chapter of the legal history is the formal adoption by the DEP in October 1998 of a Green Acres program regulation which guides the process whereby amendments may be made in a ROSI. N.J.A.C. 7:36-20.3. It is this regulation which most informed the Commissioner's decision in the present case. The regulatory process embodied in Section 20.3 did not exist, formally at least, exist when Cedar Cove was decided, and the regulation itself was promulgated to some extent in response to Cedar Cove and, as well, to implement it. The operative provisions of the regulation are:
(a) A local unit that believes its Recreation and Open Space Inventory (ROSI) does not accurately reflect those lands held for recreation and conservation purposes at the time of the local unit's receipt of Green Acres funds shall submit a written request to Green Acres to amend the ROSI by either adding or deleting a parcel(s), by correcting the area of a parcel(s), or by correcting the block and lot identification of a parcel(s) in order to accurately describe the lands held for recreation and conservation purposes.
....
(c) Green Acres shall consider the following factors, as applicable, in determining to approve or deny a request to delete a parcel from a ROSI.
1. The purpose for and the method by which the local unit acquired the parcel;
2. Whether the local unit took any formal action to dedicate the parcel for recreation or conservation purposes;
3. Any evidence relevant to the local unit's intentions regarding the use of the parcel at the time of acquisition and of receipt of Green Acres funds;
4. Whether the parcel is identified with a recreation or conservation designation on the official map of the municipality or its zoning map, or in the local unit's master plan; and
5. Whether the local unit expended funds to provide recreation or conservation *591 use of the parcel or otherwise supported or encouraged such use.

[N.J.A.C. 7:36-20.3.]

III
As we have indicated, Plainfield applied to the DEP under Section 20.3 to delete Park-Madison from its 1992 ROSI. We have also described the process, including the holding of a public hearing, by which the matter came to the desk of the Commissioner. He issued a written letter ruling on January 7, 2002. There is no dispute that that ruling, together with the actions taken thereafter by the DEP which essentially implemented the ruling by clearing the title of Park-Madison of its ROSI listing, is a final agency decision and clears the way for commercial development of Park-Madison.
The Commissioner's ruling reviews the history of the parcel. It states the basis of the decision is N.J.A.C. 7:36-20.3, quotes the five criteria of subsection (c) in full and proceeds to analyze the facts and history under those five criteria.
Under the first criteria, while concluding that the consistent purpose of acquiring the parcel was for redevelopment, and that that purpose continued from 1962 to 2000, the Commissioner acknowledged that in 1992 plaintiff used a substantial grant of public monies, the UEZ grant, to upgrade the site by installing sod, walkways and a gazebo. The Commissioner, however, declared that these measures were "interim" in nature "to improve the appearance of the site and to make it more attractive to developers". He found that following the upgrade the City took "formal actions," which he did not describe, and passed resolutions aimed at the ultimate redevelopment of the site. These culminated in 2001 with the UCIA proposal.
As to the second criteria, the Commissioner pointed out that the City never formally dedicated Park-Madison for "recreation and conservation purposes." But he also stated:
We are aware that the City held an opening ceremony for the site in 1992 after refurbishing the site with the UEZ grant. However, such actions were consistent with the City's longstanding designation of the Park-Madison site as a redevelopment parcel and its plan to make the site more attractive to potential redevelopers. We are also aware that the site was listed on the 1992 ROSI, however, for the reasons outlined in this letter, it appears the listing was in error.
With respect to the third criteria, the Commissioner described, as have we in Part I, infra pp. 7-8, how Park-Madison came to be listed on Plainfield's 1992 ROSI. We note, however, that without comment, the Commissioner found in support of Plainfield that it did not relist Park-Madison in ROSI's after 1992 even though it received several Green Acres grants after 1992.
Regarding the fourth criteria the Commissioner stated:
The Park-Madison site is not identified with a recreation or conservation designation on any official map of the City of Plainfield, on the City of Plainfield zoning map, or in the City's master plan.
Reaching the fifth criteria, the Commissioner reiterated his conclusion that the 1992 upgrade was "to improve the site for redevelopment." He acknowledged, however:
After the site was opened to the public in 1992, the City maintained the site and did issue permits for activities at the site. However, the City did not actively encourage recreational use of the site but rather, took the passive approach of *592 allowing use of the site by various civic organizations and occasional entertainment groups while actively moving forward with the redevelopment plans for the site. The City did not list the site as a park on any of its official publications or actively promote the site as a City park.
The Commissioner summarized his findings and conclusions as follows:
In summary, the primary documentation between 1962 and the present that would support a conclusion that the Park-Madison site should be classified as parkland is the 1992 ROSI, upon which the City listed the site at the suggestion of the Green Acres Program without any investigation of whether the site in fact qualified as parkland. The other category of documentation that would support the classification of the site as parkland pertains to the upgrade of the site in the early 1990's however, the City consistently stated its intention throughout the upgrade funding process to ultimately use the Park-Madison site for a redevelopment project.
He then added a significant paragraph dealing with Cedar Cove. He said:
The other relevant basis of inquiring on the parkland question is the actual use of the site by the City and the public. Although the City formally opened the site to the public in 1992 and issued permits for various events at the site between 1992 and 2000, it did not list the site as a park on any of its official publications or actively promote the site as a City park. Therefore, we do not believe that the use of the Park-Madison site by the public from 1990 through 2000 constituted "actual and approved" use of the site as parkland with the "condonation or authorization of the municipality" within the meaning of Cedar Cove v. Stanzione, 122 N.J. 202 [584 A.2d 784] (1991). Therefore, I CONFIRM the August 16, 2000 decision of the Green Acres Program determining that the Park-Madison site is not encumbered with Green Acres restrictions.
CAFES and the Sierra Club raise the following issues on appeal:
POINT I
THE GREEN IS PROTECTED PARKLAND UNDER CEDAR COVE, SUCH THAT NJDEP SHOULD HAVE REQUIRED A DIVERSION PROCEEDING RATHER THAN REMOVING THE GREEN FROM THE ROSI BY CLERICAL AMENDMENT.
A. CEDAR COVE PLAINLY PROHIBITED A FINDING UNDER N.J.A.C. 7:36-20.3 THAT THE PRESENCE OF THE GREEN ON THE PLAINFIELD ROSI WAS A CLERICAL ERROR.
B. THE GREEN ACRES DIVERSION REGULATIONS WOULD PROVIDE A MUCH NEEDED OPPORTUNITY TO EVALUATE ALTERNATIVES AND PROVIDE APPROPRIATE REPLACEMENTS IF NECESSARY.
POINT II
NJDEP'S CONCLUSION THAT THE PRESENCE OF THE GREEN ON PLAINFIELD'S ROSI WAS A CLERICAL ERROR IS PLAINLY UNSUPPORTED AS A FACTUAL MATTER.
We agree with this argument and reverse.

IV
We recognize that our review of final state agency action is necessarily and properly limited. In re Taylor, 158 N.J. 644, 656, 731 A.2d 35 (1999). Once an agency has issued its final decision, "the Appellate Division's initial review of that decision is a limited one." Ibid. "[A]n *593 appellate court will reverse the decision of the administrative agency only if it is arbitrary, capricious or unreasonable or it is not supported by substantial credible evidence in the record as a whole." Henry v. Rahway State Prison, 81 N.J. 571, 579-80, 410 A.2d 686 (1980). In particular, due deference must be afforded to an agency charged with implementing a legislative program. Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 70-71, 494 A.2d 804 (1985). Because agency action is presumed to be valid and reasonable, our initial inquiry is limited to determining whether the agency action violates the enabling act's legislative policies or the Constitution; whether the record supports the action; and whether the agency reached a conclusion which could not have been made upon a showing of the relevant factors. In re Taylor, supra, 158 N.J. at 656, 731 A.2d 35.
Despite this deference, our review of an agency decision is "not simply a pro forma exercise in which we rubber stamp findings that are not reasonably supported by the evidence...." Chou v. Rutgers, 283 N.J.Super. 524, 539, 662 A.2d 986 (App.Div.1995), certif. denied, 145 N.J. 374, 678 A.2d 714 (1996). Rather, we must undertake a "careful and principled consideration of the agency record and findings...." Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93, 312 A.2d 497 (1973). Furthermore, "[a]n appellate tribunal is... in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." Ibid.
It is clear at the outset that one of DEP's several significant functions is the administration of the Green Acres program. Green Acres was enacted to provide lands for public recreation, the conservation of natural resources and to promote public health and welfare in light of the needs of an expanding population. N.J.S.A. 13:8A-36. Thus, the Act provides that lands held for conservation and recreation by a public entity at the time the entity receives Green Acres funding cannot be diverted to another use, without approval of the Commissioner and State House Commission. N.J.S.A. 13:8A-47(b); N.J.A.C. 7:36-21.1.[3]
It is safe to say that this process threw up a considerable practical barrier to diversion or disposition of such lands. Section 21.1 by its strict requirements effectively buttressed the statutory mandate that such lands were not to be disposed of or diverted for other than recreational or conservation purposes while, at the same time, providing a regulated opportunity to apply to do so under limited circumstances and upon definite conditions. In that sense, N.J.S.A. 13:8A-47b, Section 21.1 and Cedar Cove taken together represent a legislative, executive and judicial consensus on a significant policy which protects the public interest in the maintenance of open space and recreational lands under the Green Acres program.
As we have stated, infra pp. 17-18, in 1998 the DEP adopted by regulation a processa short cut of the older regulatory process described in Cedar Cove whereby a public body may request that lands be deleted from its ROSI, if it "does not accurately reflect those lands held for recreation and conservation purposes at the time of the local unit's receipt of Green Acres funds...." N.J.A.C. 7:36-20.3. It is Section 20.3 which Plainfield invoked in the case of Park-Madison.
However, in reviewing the Commissioner's decision, we must harken back to the statutory basis upon which rests any authority Section 20.3 may possessthat is *594 N.J.S.A. 13:8A-47b. The Supreme Court has described the legislative history and the purpose of the statute.
When the Legislature added Subsection 47(b) in the 1975 Act, it extended the restriction to all conservation and recreational lands already owned by a municipality at the time it received State funds for additional acquisition or development. The inference to be drawn from this addition is that the Legislature intended to prevent municipalities from using State funds to purchase or develop new properties, while converting comparable existing lands to more profitable commercial or residential development. Thus, subsection 47b was designed to fulfill the Green Acres objective of augmenting the overall amount of land devoted to recreation and conservation, and to ensure that municipalities would preserve existing lands devoted to Green Acres uses, whenever they look to the State for Green Acres funding to acquire or develop additional properties. The language of the subsection comports with that intendment.
 [Cedar Cove, supra, 122 N.J. at 211,
 584 A.2d 784.]
Accordingly, we hold that the Section 20.3 procedure whereby the DEP is empowered to delete Green Acre lands from ROSIs by declaring that the listing of such lands was inaccurate must be construed as an exception to diversion under Section 21.1. Moreover, that exception must be construed strictly so it does not swallow-up the statutory mandate and the Section 21.1 diversion process. A public body should not be accorded relief under Section 20.3 except in the clearest case of a bona fide inaccuracy in its filed ROSIs for the relevant years. Any other approach would open the door to opportunistic and self-serving admissions of inaccuracies in ROSIs in order to seize upon lucrative commercial ratables in derogation of a fundamental underpinning of the Green Acres program and without the studied protections of the public interest afforded by the diversion procedure under Section 21.1.
Based on these standards, we are satisfied that, contrary to the Commissioner's ruling, Plainfield did not prove that it listed Park-Madison in error in its 1992 ROSI. We hold that the Commissioner, by according insufficient weight under Section 20.3 to the eight year history of use of Park-Madison for recreation and conservation purposes between 1992 and 2001, use which Plainfield both condoned and encouraged, failed to properly apply Section 20.3. Cedar Cove, supra, 122 N.J. at 217-18, 584 A.2d 784. ("even if a municipality appears to have intended such property for commercial development, where such development remains wholly executory, any such intent would not outweigh the property's actual and approved use for recreation or conservation.") We are constrained to conclude that the Commissioner's ruling watered-down N.J.S.A. 13:8A-47b, dispatched Cedar Cove to the sideline and thus eviscerated a keystone of the Green Acres program.
Plainfield relies substantially upon the fact that its original 1962 acquisition of Park-Madison arose out of a blight declaration. It points to its further actions since then attempting to redevelop the site for commercial purposes under the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 to -49, and its predecessor. It contends that because its commercial plans for the site have arisen out of specific statutory authority, they cannot now be thwarted by any commitment it may have made to Green Acres. Plainfield also argues that in this respect it stands on an entirely different footing than did South Toms River in Cedar Cove.
*595 We reject these arguments. It is true that one of the Section 20.3 criteria, N.J.A.C. 7:36-20.3(c)(1), directs consideration be given to the purposes of the original acquisition of the site. We note, however, initially, that the Commissioner, while he did set forth the history of Plainfield's acquisition of the site, did not himself reason that any constitutional or statutory provision bound Plainfield to a commercial redevelopment of the site. It is clear that redevelopment into open space or recreational land is not inconsistent with the definition of "redevelopment" contained in N.J.S.A. 40A:12-3. Secondly, while we agree that Plainfield's acquisition of Park-Madison differed materially from the manner in which South Toms River acquired Mathis Plaza, it is a difference which does not control the outcome of the case. South Toms River had just as strong a hope and motivation as did Plainfield for the ultimate realization of the economic potential from its site. Cedar Cove, supra, 122 N.J. at 207-208, 584 A.2d 784. Indeed, South Toms River leased two of its lots to commercial enterprises and it never listed the remaining ones on a ROSI. For the Cedar Cove Court, however, the actual use of the site "encouraged and condoned by the municipality" became the critical test of the applicability of the statute.
In other respects we conclude that the Commissioner's findings either do not support the result he reached, are not supported by the record, and are irrelevant to the question of whether Plainfield mistakenly listed Park-Madison in its 1992 ROSI. For instance, the Commissioner in considering Subsection 20.3(c)3 pointed out that Plainfield did not list Park-Madison in ROSIs between 1995 and 2000 even though it received Green Acres funding after 1992. See infra pp. 19-20.
However, the record does not show that the reason Plainfield failed to list Park-Madison between 1995 and 2000 was that it inaccurately listed it in 1992. The Commissioner made no such finding. Furthermore, the record does not demonstrate that deleting Park-Madison from the 1995 through 2000 ROSIs was accomplished upon any specific notice to or with the approval of the Green Acres program in conformity with any regulatory procedure. Thus, the deletion of Park-Madison from later ROSIs lends no weight to the Commissioner's conclusion that Plainfield listed Park-Madison in error in 1992.
We further hold that the Commissioner's characterization of Plainfield's role in encouraging and supporting the recreational use of Park-Madison as "passive" in his analysis of Subsection 20.3(c)5 is wide of the mark. See infra p. 20. Putting up informational signs, providing a system of permits for public use, considering and granting such permits, expending public monies to facilitate use, and granting leases for recreational use can hardly be described as "passive" municipal involvement in the use of Park-Madison. See infra p. 9.
The Commissioner's parallel finding that the use of Park-Madison between 1990 and 2000 did not "constitute `actual and approved' use of the site as parkland with the `condonation or authorization' of the municipality" is also unsupported by the record. See infra p. 21. The record demonstrates exactly the opposite. Plainfield turned Park-Madison into a public park, received public money to do so, and based on the facts stated above not only authorized but encouraged its use as a place of public recreation. Park-Madison's listing on Plainfield's 1992 ROSI, was consistent with those decisions.
We also reject the Commissioner's conclusion that Plainfield included Park-Madison *596 in its 1992 ROSI "without investigation of whether the site in fact qualified as parkland." See infra p. 20. The circumstances surrounding the inclusion of the site are fully described in the record. See infra p. 8. At worst, those facts suggest that it was included to curry favor on the part of those considering Plainfield's application for Green Acres funding. At best, its listing was a frank recognition that the City had just applied for, obtained and used a substantial part of $362,000 of the public's money, the UEZ grant, to turn the site into a park. The Commissioner's finding does not support an error on Plain-field's part.
It is, however, by relying on Plainfield's failure to include Park-Madison in any of its "official publications" or designating it as a park on its official map, zoning map or master plan that the Commissioner most departs from Cedar Cove. In so doing, the Commissioner adopted our reasoning in Cedar Cove, later disapproved by the Supreme Court, that the Borough there demonstrated no "permanent resolve" to dedicate the site to open space or recreational use. Cedar Cove, supra, 233 N.J.Super. at 343, 558 A.2d 1351. On the contrary, the Court held that it was the actual use to which the site was put, not how the site was officially designated, which governed the outcome of the case. Cedar Cove, supra, 122 N.J. at 217-18, 584 A.2d 784. Likewise here, we accept the proposition that Plainfield intended throughout its ownership of Park-Madison to redevelop it for commercial purposes. Those plans lasted for thirty years. But in 1992, making a difficult policy choice, Plainfield deliberately turned Park-Madison into an active open space and a community recreational and cultural center which would have remained forever had not its older dream suddenly materialized. For the Commissioner to now hold that that deliberate policy choice was a mere inaccuracy in Plainfield's ROSI violates the statute as construed in Cedar Cove and exalts Section 20.3 into a process to avoid the strictures of Section 21.1. Doing so undermines the statute.
Reversed.
NOTES
[1] In August 1992, this statute was repealed and replaced with the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 to 49.
[2] This statute creates an enterprise zone assistance fund to be held by the State Treasurer into which local retail sales tax receipts are deposited. N.J.S.A. 52:27H-88. The fund's purpose is to assist qualifying municipalities, in which enterprise zones are located, in undertaking public improvements. Ibid.
[3] Subchapter 21 is titled, "Procedures for Commissioner and State House Commission approval of the disposal or diversion of funded or unfunded parkland."