**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1946-19

IN THE MATTER OF ERIC
BEAGIN, CITY OF PATERSON,
FIRE DEPARTMENT.

_____

Argued April 26, 2022 – Decided June 28, 2022

Before Judges DeAlmeida and Berdote Byrne.

On appeal from the New Jersey Civil Service Commission, Docket No. 2016-1336.

Charles J. Sciarra argued the cause for appellant Eric Beagin (Sciarra & Catrambone, LLC, attorneys; Charles J. Sciarra and Deborah Masker Edwards, of counsel and on the briefs).

Kenneth B. Goodman argued the cause for respondent City of Paterson, Fire Department (O'Toole Scrivo, LLC, attorneys; Kenneth B. Goodman, on the brief).

Matthew J. Platkin, Acting Attorney General, attorney for respondent New Jersey Civil Service Commission (Pamela N. Ullman, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Eric Beagin appeals from a final administrative action of the Civil Service Commission (CSC) affirming his removal from employment as a Paterson firefighter and failing to adopt the Administrative Law Judge's (ALJ) recommendation to reverse the removal. Because we find the Paterson Fire Department failed to prove the drug testing equipment was properly calibrated and standard operating procedures were followed when Beagin's drug test was performed, we conclude the CSC's decisions are not supported by sufficient, credible evidence in the record and are arbitrary, capricious, and unreasonable. We therefore reverse, vacate the final administrative action, and order reinstatement of Beagin to his position as a Paterson firefighter.

## I.

On July 17, 2015, Beagin underwent a random urine drug screen in connection with his employment as a firefighter with the Paterson Fire Department (PFD). The urine sample was sent to the New Jersey State Toxicology Laboratory (State Lab) which reported Beagin's urine screen was positive for oxycodone, a substance not produced by any medication listed on his medication sheet. Beagin was served a preliminary notice of disciplinary action, immediately suspending him from his employment with the PFD pursuant to N.J.A.C. 4A:2-2.5(a)(1) and seeking the termination of his

employment, charging him with conduct unbecoming a public employee and other sufficient cause pursuant to N.J.A.C. 4A:2-2.3(a), and violating the statutory standard of behavior required of firefighters pursuant to N.J.S.A. 40A:14-17 and Karins v. City of Atlantic City, 152 N.J. 532 (1998). By final notice of disciplinary action dated September 18, 2015, Beagin was removed from his position effective that day.

Beagin filed an appeal with the CSC, and the contested matter was referred to the Office of Administrative Law (OAL) for a hearing. On March 11 and 15, 2019, a hearing was held before ALJ Celentano.[1] The ALJ issued an initial decision recommending Beagin be reinstated to the position of firefighter and an order requiring the City of Paterson to pay Beagin his base salary beginning March 12, 2019.

PFD filed exceptions with the CSC. On December 4, 2019, the CSC advised Beagin it did not adopt the recommendations of the ALJ, instead upholding his removal from the PFD. The CSC also advised its "written determination in this matter should be issued in the near future." The CSC

---

[1] The multi-year delay in holding the hearing is explained in the ALJ's opinion and is not a subject of this appeal.

issued its final administrative action on December 19, 2019. This appeal followed.

II.

On July 17, 2015, the State Lab reported Beagin's random urine screen positive for oxycodone at 114 ng/mL, 14 nanograms over the State Lab's defined cutoff of 100 ng/mL. At the OAL hearing, Beagin contested only the validity of the drug test results, stipulating if the test results were upheld as valid, his termination should be upheld given his employment in a public safety position. The parties further stipulated if the testing was deemed unreliable, the termination would be reversed. Because the only contested issue was the reliability and trustworthiness of the drug testing performed by the State Lab, the ALJ heard testimony from only two expert witnesses, with the parties stipulating to the witnesses' expertise and their ability to testify with regard to drug testing procedures.

First, the ALJ heard from Dr. Robert Havier, who for the past eight years had held the position of Acting Director of the State Lab and had worked at the lab for forty years. Dr. Havier testified all urine samples received by the lab are initially screened by an immunoassay test, which determines whether the sample is positive for any of the drugs being tested. If the immunoassay test shows a

4

positive result,[2] the same sample is further tested using gas chromatography, mass spectrometry, (GC/MS), to confirm the identity and the concentration of the drug(s) detected. The GC/MS testing produces a numerical score, indicating the amount of any drug present in the sample. Beagin's sample was tested by GC/MS for six different drugs, all in the opiate class.

Dr. Havier testified before testing each donor sample, five or six calibrators are used to calibrate the instrument such that test results may be validated. He explained clean urine samples are prepared by the lab or purchased by the lab from third-party providers. The samples are mixed with a concentration, a known value for each of the specific drugs being tested. For every test, the analyst first establishes a linear relationship between the instrument response and each of the calibrators. The analyst then tests the donor's sample and receives a response from the instrument. The results of the donor's sample are plotted against the straight line established by the calibrators to allow the analyst "to translate the instrument response to a concentration based on that linear relationship with the calibrators."

---

[2] Dr. Havier testified the immunoassay uses "antibodies [which] are not 100% specific for a particular drug. If they detect a chemical similar in structure to a drug it would identify it as that drug" which is why confirmatory testing is necessary to prove an accurate result.

5

Dr. Havier further testified the analyst has the discretion of eliminating as many as two out of the five or six calibrators if they do not fit neatly along the line because the lab wants "to establish the best straight-line relationship."  For a test to be considered valid, the analyst is required to have a minimum of three calibrators to establish the linear relationship.  Dr. Havier also testified to an industry standard,[3] utilized by the State Lab for the forty years he has been there, which permits the calibrators to deviate up to twenty percent from the expected value without invalidating the calibrator used.  If any calibrator deviates more than twenty percent, the calibrator's results are excluded and different calibrators must be used to establish the linear relationship.

Dr. Havier did not personally test Beagin's sample, although he signed off on the written test results.  Beagin's sample was received by the State Lab on July 17, 2015 and the initial immunoassay screening, which produced a positive result, was performed on July 21, 2015.  Thereafter, GC/MS testing of the same sample on the following day confirmed the presence of oxycodone at 114 ng/mL.

Dr. Havier testified the analyst used five calibrators to calibrate the GC/MS instrument.  Three of the calibrators produced results that were close to

---

[3] Dr. Havier did not produce an expert report prior to his testimony.  The PFD produced raw testing data, which Dr. Havier relied upon in his testimony.

 A-1946-19

one another, so those were used to develop the linear relationship against which Beagin's sample was tested. The other two calibrators were eliminated. The first calibrator tested did not produce reliable results for any of six opiates tested, against an expected concentration of 400 ng/mL, and was discarded. The second calibrator produced results of 199.8 ng/mL for oxycodone[4] against an expected concentration of 200 ng/mL and was used to establish the linear relationship. The third calibrator did not produce reliable results for the six opiates, at an expected concentration of 100 ng/mL, and was discarded. The fourth calibrator produced a result of 50.7 ng/mL against an expected concentration of 50 ng/mL and was utilized in the linear relationship. The final calibrator produced a result of 24.3 ng/mL of oxycodone for an expected concentration of 25 ng/mL and was also used to establish the linear relationship.

The four concentrations used were tested immediately after the calibrators. The results all exceeded their expected concentration values. The first concentration, expected to result in 125 ng/mL, returned a result of 130 ng/mL of oxycodone, although it produced more accurate results for the other drugs in the opiate class. Dr. Havier testified the same sample was "reinjected"

---

[4] These calibrators produced different results for the other five compounds in the opiate class. We address only the results for oxycodone because that is the only issue before the court.

A-1946-19

into the machine to determine if it would provide a closer result, and the result was 115.3 ng/mL of oxycodone against an expected value of 100 ng/mL. Both of these results consistently demonstrate the concentration used was 5 ng/mL higher than its expected result. The second concentration, expected to produce a value of 100 ng/mL, returned a result of 116.4 ng/mL, the third returned 75.7 ng/mL instead of 75 and the fourth returned no concentration, as expected.

Dr. Havier testified the high concentration results used did not invalidate Beagin's test results and Beagin's test results were positive for oxycodone above the acceptable level of 100 ng/mL.[5] Dr. Havier explained the twenty percent variation permitted pursuant to industry standards applies only to calibrators used to calibrate the instrument. The same twenty percent variation is not applied to a donor's urine sample. Therefore, Dr. Havier explained it would be incorrect to deduct fifteen or sixteen points from Beagin's test results (the deviation from the 100 ng/mL positive benchmark), such that his result would be reported as negative for oxycodone, as Beagin's counsel suggested.

Dr. Havier was also questioned with respect to a urine sample tested prior to Beagin's sample, which had a result of 12,119 ng/mL for oxycodone,

---

[5] No testimony was elicited as to why the cutoff for oxycodone is established at 100 ng/mL other than "the lab sets the cutoff."

<span>A-1946-19</span>

suggesting there was carryover or possible cross-contamination from that test that affected Beagin's results. Dr. Havier stated a negative/blank urine sample is run through the machine between tests of each individual's urine sample. Therefore, there was no carryover from the previous test.

Dr. Lyle Hayes testified on behalf of Beagin. He is a New York State certified forensic toxicologist who, for the last fifteen years, has been the director of drug testing laboratories certified by the State of New York and the College of American Pathologists. Dr. Hayes presented several reasons Beagin's test results were unreliable. First, Dr. Hayes testified all of the calibrators used by the laboratory on the day of Beagin's testing gave results above their expected concentration amounts for oxycodone and Beagin's result of 114.5 ng/mL was lower than the results produced by any of the concentrations for that specific drug. Dr. Hayes testified this indicated "[t]hat there's a bias or an inaccuracy in the calibration" of the GC/MS instrument and the testing instrument was "biased high." He noted the concentration of oxycodone in Beagin's urine was less than those of the calibrator and controls at the critical cutoff of 100 ng/mL.

Secondly, Dr. Hayes expressed concern the State Lab was not certified at the time of Beagin's testing in 2015, having become certified by the College of American Pathologists later in 2016. He noted when undergoing the

9

certification process, the College of American Pathologists noted an analyst pipetted a sample from one specimen and passed the tip of the pipet over open tubes of another specimen, with a drip from the pipet observed. This raised concern regarding potential cross-contamination, an issue significant to him because the urine sample tested immediately prior to Beagin's sample had an inordinately high result.

Dr. Hayes concluded Beagin's "results should have been reported as negative because the calibration was biased by more than the amount of his . . . positive result." In his report, he concluded:

> In summary, there was a lack of accuracy in calibration and the bias at the cutoff . . . in which known controls and calibrators of 100 ng/mL gave values of 115-123 ng/ml while Mr. Beagin's specimen was 114 ng/mL. These facts indicate that Mr. Beagin's level as reported is less than the levels measured in calibrators and controls prepared to have the exact 100 ng/mL cutoff. His specimen should be deemed negative for oxycodone.

### III.

Beagin argues the CSC's final administrative action should be reversed as arbitrary, capricious, and unreasonable: (1) because it was filed beyond the forty-five day time period set forth at N.J.S.A. 40A:14-204 and (2) because it is not supported by substantial credible evidence in the record. He also argues,

due to the unreliability of the drug test results, the charges asserted in the FNDA should be dismissed.

The ALJ issued a decision and recommendation to reverse the PFD's termination of Beagin's employment. After carefully reviewing all of the expert testimony, the ALJ found PFD had failed to sustain its burden of proof, specifically questioning the accuracy of Beagin's urine test result compared to the higher test results for the calibrators:

> Significant confusion exists from both the documents submitted into evidence and the testimony of Dr. Havier, his assertions as to the acceptable variation or deviation application to the GC/MS test, and the notion of an accepted degree of error for control samples. No explanation was offered as to why the 20 percent error margin is applicable to the samples in the GC/MS procedure but not to appellant's specimen. If the 20 percent error margin were applied to appellant's specimen, that would bring his result below the cutoff of 100.

The ALJ specifically reopened the record and invited Dr. Havier to return to testify on the issues of the twenty percent industry standard and its alleged inapplicability to individual donor test results. PFD did not produce him or any other evidence after the record was reopened.

Concluding the PFD had not met its burden of proof to support Beagin's termination, the ALJ stated:

11

> With no justification for the acceptability of a 20 percent variation only for control samples with a known concentration, there is no reason and no support for not applying the same error margin to appellant's specimen.
>
> The burden of proof rests with respondent in this case, and the lack of any support in the record for what is being advanced as the support for a finding of a controlled-dangerous-substance violation, resulting in termination, cannot stand.
>
> Thus, I CONCLUDE that respondent has not proven by a preponderance of the credible evidence that appellant's specimen was beyond the margin of error for testing of oxycodone, and further CONCLUDE that his removal is unsupported and cannot stand.

The CSC rejected the ALJ's recommendation and ordered Beagin's removal be upheld. The CSC did not disagree with any findings of fact made by the ALJ. Instead, it disagreed with the ALJ's reliance upon certain facts over others. The CSC explained:

> [T]he summary of the witness testimony presented . . . in this decision is based on the Commission's own review of the testimony presented at the hearing. While this summary may have a somewhat different focus, it is substantially consistent with the ALJ's recitation of the testimony in the initial decision.

The CSC rejected the ALJ's concern regarding the accuracy of Beagin's test results, noting Dr. Hayes did not refute Dr. Havier's testimony that the State Lab had followed industry standards when testing Beagin's urine sample.

12

Secondly, the CSC found no support for Dr. Hayes's suggestion there may have been cross-contamination from the urine sample tested immediately before Beagin's sample because Dr. Havier testified a blank sample had been run between the two tests.

Beagin's claim the CSC's decision should be rejected as untimely is without merit. The CSC had forty-five days from receipt of the ALJ's initial decision to issue its final administrative action. N.J.S.A. 40A:14-204; N.J.S.A. 52:14B-10(c). It also had the authority to extend that deadline by up to forty-five days upon a showing of good cause and with approval of the OAL. N.J.S.A. 52:14B-10(c); N.J.A.C. 1:1-18.8(e). And, pursuant to N.J.S.A. 40A:14-204, it had the discretion to extend the forty-five day decision deadline by fifteen days given Beagin's employment as a firefighter. See In re Restrepo, Dep't of Corr., 449 N.J. Super. 409, 418-19 (App. Div. 2017) (holding that N.J.S.A. 40A:14-204 controls over N.J.S.A. 52:14B-10(c)).

The ALJ issued the initial decision on October 24, 2019. Forty-one days later, on December 4, 2019, the CSC issued an order pursuant to N.J.S.A. 52:14B-10(c) and N.J.A.C. 1:1-18.8, extending for good cause the time for it to issue a final decision by fifteen days, to December 23, 2019. That order was approved by the OAL. The CSC issued its final administrative action within

13

that fifteen-day extension, on December 19, 2019. Therefore, the CSC's final administrative action was timely whether the extension is considered valid pursuant to the good cause standard of N.J.S.A. 52:14B-10(c) and N.J.A.C. 1:1-18.8(e), or the discretionary standard of N.J.S.A. 40A:14-204 and Restrepo, 449 N.J. Super. at 418-24.

We agree with Beagin's claim the CSC's decision is unsupported by substantial, credible evidence in the record. Our role in reviewing a final administrative agency decision is limited. In re Taylor, 158 N.J. 644, 656 (1999); Clowes v. Terminix Int'l Inc., 109 N.J. 575, 587 (1988). We must defer to a final agency decision unless it is arbitrary, capricious, or unsupported by substantial, credible evidence in the record. Taylor, 158 N.J. at 657. We must, therefore, determine whether the agency's findings could have reasonably "'been reached on sufficient credible evidence present in the record' considering 'the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility.'" Id. at 656 (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)). If we find sufficient, credible evidence in the record to support the agency's conclusions, then we must affirm even if we would have reached a different result. Clowes, 109 N.J. at 588; Goodman v. London Metals Exch., Inc., 86 N.J. 19, 28 (1981).

If, however, our review of the record satisfies us the agency's finding is clearly mistaken or erroneous, the decision is not entitled to judicial deference and must be set aside. L.M. v. State Div. of Med. Assistance & Health Servs., 140 N.J. 480, 490 (1995). We may not simply rubber-stamp an agency's decision. Taylor, 158 N.J. at 657.

The CSC's decision is erroneous because it 1) misunderstood Dr. Havier's testimony regarding application of the twenty percent standard, never addressing the issue of whether the testing equipment was calibrated to be biased high, and 2) shifted the burden to Beagin to prove how the industry standard is applied.

First, the CSC misunderstood Dr. Havier's testimony regarding the twenty percent variation. It cited to testimony not in the record, stating the twenty percent variation is applied to the discarded calibrators and not those used to establish the linear relationship. It found "[Dr.] Havier emphasized that the analysis of the calibrations was accurate since the analysis returned three accurate results and the other two values were within a 20 percent variation for those samples with known concentrations." In reviewing the PFD's exceptions the CSC again noted "[Dr.] Havier testified that at least three of the five calibrators must establish a linear relationship (i.e., almost identical readings to those of the known concentrations) and that the reading from the other

15

calibrators <u>not used</u> must be within 20 percent of the cutoff for the equipment so as not to invalidate the equipment as inaccurate." (emphasis added).

The record establishes the calibrators for expected concentrations of 200, 50, and 25 ng/mL respectively all produced a straight line. Therefore, we can accurately conclude Beagin's sample was positive for oxycodone above 50 but below 200 ng/mL. However, the cutoff for oxycodone is 100 ng/mL. Dr. Havier admitted no calibrator of 100 ng/mL produced a result that could be plotted in the straight line produced by the 200, 50 and 25 ng/mL calibrators. Instead, the 100 ng/mL concentration utilized to calibrate the machine, and not discarded, produced an initial result of 116.4 ng/mL, then 115.3 when reinjected. Beagin's test result of 114.5 ng/mL, although above the 100 ng/mL cutoff, plotted below the concentrations for oxycodone. Despite cross-examination on this issue, Dr. Havier offered no testimony as to why Beagin's lower result was not deemed negative given the higher results of the calibrators utilized to plot the linear relationship.

> Q: So your machine was picking up more oxycodone on your test of samples right, which should have a specific number. Your machine was picking up more on the test samples than it actually picked up over the line for my client, correct?
>
> A: Correct.

A-1946-19

He gave no testimony as to the standard operating procedure to be followed where a donor sample tests above the cutoff but below the concentration result for that drug. Instead, Dr. Havier relied on an industry standard permitting a twenty percent deviation in the concentration result used to calibrate the machine but not to measure the donor sample. The CSC found support for an industry standard where there was none in the record. It is the PFD's burden to prove an industry standard exists.[6] Dr. Havier's testimony that the twenty percent deviation has been utilized by the State Lab for forty years is not proof of an industry standard. The sum of his testimony on this issue was as follows:

> Q. Okay. First of all this 20 percent, is that what you allow?
>
> A. That's what the standards use.
>
> . . . .
>
> Q. When you say the "industry standard," what knowledge do you have with the industry standard? Is it written somewhere your knowledge [sic] of other labs? When you say the "industry standard?"

---

[6] We recognize the witness was well known to the attorneys conducting his direct testimony and cross-examination from other, prior matters and the State Lab's resources place Dr. Havier's time at a premium. However, the witness' bare bones direct testimony failed to establish a foundation, and Beagin's counsel's references, without specifics, to testimony Dr. Havier supplied in other matters, failed to address the issues raised by Beagin in his appeal. Dr. Havier's rebuttal testimony, which did not address Dr. Hayes' opinion the machine was calibrated to bias high, was equally lacking.

A-1946-19

A. The cutoffs and in fact even the procedures are well established. They're based usually on the federal government's urine testing program for the military. Again all the drug testing programs and law enforcement drug testing programs are based on that. The acceptability of variance.

PFD failed to present any evidence regarding the genesis or source of an industry standard, any specifics as to why 100 ng/mL is the cutoff for oxycodone, or why twenty percent is the acceptable deviation. He vaguely referred to "procedures" and drug testing "programs" based "usually" on the standard. He did not cite to standard operating procedures for the State Lab. Although the parties stipulated to the expertise of the two experts, nothing in the record demonstrates they stipulated to standard protocols or procedures for testing. N.J.R.E. 703 requires an expert's opinion be based upon facts or data. An expert's bare conclusions, unsupported by factual evidence or other data, are inadmissible as a mere net opinion. State v. Townsend, 186 N.J. 473, 494-95 (2006); See also C.W. v. Cooper Health Sys., 388 N.J. Super. 42, 64-65 (App. Div. 2006) (finding impermissible net opinion where expert failed to explain why his announced standard of care was the "accepted practice").

More importantly, even assuming industry standards allow a twenty percent deviation only to the calibrators, Dr. Havier provided no testimony

18

regarding the issue in this case: what is the appropriate testing protocol for a situation where the individual's sample renders a result above the cutoff for a particular drug but below all of the concentrations used in the calibrators to plot the linear relationship that establishes proper calibration of the equipment. PFD's failure to address this critical issue establishes it failed to meet its burden of proof the testing equipment was correctly calibrated when it tested Beagin's sample and his results are valid.

The CSC also incorrectly shifted the burden of proof to Beagin to demonstrate the twenty percent deviation should not apply, either to the calibration results or his test results. Because Dr. Havier did not produce an expert report prior to his testimony, Beagin's expert had no knowledge Dr. Havier would be relying on an industry standard during his testimony of the test results. It faulted Beagin's expert report for not addressing a standard Dr. Havier introduced for the first time at trial. The CSC stated:

> Havier testified that the cutoffs and procedures that the Lab used in calibrating the equipment in this matter were industry standards that are well established based on the federal government's urine testing program for the military. A review of testimony does not indicate that at any point did the appellant's attorney ask Hayes if the industry standards that Havier describes were, in fact, the industry standards. At no point during Hayes' testimony did Hayes offer that the standards that Havier describes were not the industry standards. A review of

19

> Hayes' report that was submitted into evidence does not question the standards that Havier describes. . . . As such, the Commission finds that Havier's testimony regarding the industry standards was credible and persuasive.

It was not Beagin's burden to demonstrate the industry standard does not exist or was misapplied to his drug test. PFD had full notice the only issue on appeal was the validity of Beagin's drug test results and bore the burden to proving Beagin's tests were performed in adherence to applicable standards. The CSC's shifting of this burden to Beagin was arbitrary and capricious.

Finally, Dr. Havier testified there should be numerous processes to determine if the testing equipment is operating properly. He admitted if a sample for oxycodone tested over 1000 ng/mL or more than 10,0000 ng/mL or both, that result would be peculiar and out of the ordinary. In fact, he initially testified he had never seen a result over 10,000 for oxycodone. Upon being shown the State Lab's documents, he confirmed the donor sample tested immediately before Beagin's sample tested positive for oxycodone at 12,119 ng/mL. A second test performed on this donor sample was too large to even read.

Initially, Dr. Havier testified all of the calibration tests and individual donor tests performed on that machine that day were recorded in chronological

A-1946-19

order on the Summary of Test Results sheet (Summary) signed by the analyst who performed the tests on July 23 and certified by him on July 27. That summary shows the donor sample was tested immediately prior to Beagin's two tests, with no blank urine test performed in between. The first test for the donor sample was diluted to 1:20 and produced a result of 12,119.1 ng/mL of oxycodone. The second, undiluted test produced a result "TOO LARGE" to record. There is no evidence of a blank test having been performed on the Summary. When cross-examined, Dr. Havier corrected his earlier testimony and stated the Summary did not, in fact, list all of the testing performed on the machine that day in chronological order and referred to another, unsigned document for the appropriate chronology of tests performed that day. That document contains the notation "blank urine," without providing the result of that blank test, after the donor sample was tested twice and before Beagin's two tests were performed.

The first test of Beagin's sample, diluted[7] to a concentration of 1:10 produced no finding for oxycodone. The second, undiluted sample produced the 114.5 result for oxycodone at issue. Dr. Hayes testified "that's a red flag in

---

[7] Once again, there was no testimony elicited by either counsel as to why diluted tests are run, why they are run before undiluted tests are run, or why the first donor sample was diluted to 1:20 but Beagin's sample was diluted to 1:10.

21

forensics. If you have a very high specimen then you have to be careful to not have carryover because it can contaminate the instrument." Dr. Hayes testified PFD did not provide the raw data for the two donor tests run before Beagin's tests and did not provide the gas chromatography for the blank urine sample run in between, which would have confirmed or disproved cross-contamination. On the basis of this lack of documentation, the CSC's finding that cross-contamination from the donor sample tested before Beagin's sample was not present because a blank sample had been run between the tests is not adequately supported by the credible evidence in the record.

Because we find the CSC erred in concluding PFD met its burden of proving Beagin's drug test results were reliable and the testing equipment was properly calibrated using industry standards and accepted testing protocols, we reverse. Although we would ordinarily vacate the CSC's decision and remand for additional factfinding and further consideration, see, e.g., George v. City of Newark, 384 N.J. Super. 232, 245 (App. Div. 2006), because the parties stipulated if the testing was found to be unreliable the termination would be reversed, we vacate the final administrative action and order reinstatement of Beagin to his position as a Paterson firefighter.

Reversed. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22

A-1946-19